# In the United States Court of Federal Claims

### No. 19-61C
### Filed: July 2, 2019
### Redacted Version Issued for Publication: August 12, 2019[1]

| | |
|---|---|
| * * * * * * * * * * * * * * * ** | * |
| | * |
| **SAFEGUARD BASE OPERATIONS, LLC,** | * |
| | * |
| | * |
| Protestor, | * |
| | * |
| v. | * |
| | * |
| **UNITED STATES,** | * |
| | * |
| Defendant, | * |
| | * |
| v. | * |
| | * |
| **B&O JOINT VENTURE, LLC,** | * |
| | * |
| Defendant-Intervenor. | * |
| | * |
| * * * * * * * * * * * * * * * ** | * |

Post-Award Bid Protest; Motion to Dismiss; Cross-Motions for Judgment on the Administrative Record; Standing; Solicitation Interpretation; Waiver; Clarifications; Best-Value Tradeoff.

**Alex D. Tomaszczuk**, Pillsbury Winthrop Shaw Pittman, LLP, Los Angeles, CA, for protestor. Of counsel were **Alexander B. Ginsberg,** Pillsbury Winthrop Shaw Pittman, LLP, McLean, VA, and **Aaron S. Ralph** and **Kevin R. Massoudi**, Pillsbury Winthrop Shaw Pittman, LLP, Los Angeles, CA.

**P. Davis Oliver**, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Joseph H. Hunt**, Assistant Attorney General. Of counsel was **James C. Caine**, Attorney, Federal Law Enforcement Training Centers, Glynco, GA.

**Richard W. Arnholt**, Bass, Berry & Sims PLC, Washington, D.C., for defendant-intervenor. Of counsel were **Todd R. Overman** and **Sylvia Yi**, Bass, Berry & Sims PLC, Washington, D.C.

---

[1] This Opinion was issued under seal on July 2, 2019. The parties were asked to propose redactions prior to public release of the July 2, 2019 Opinion. Protestor, defendant, and defendant-intervenor all proposed redactions to the court's July 2, 2019 Opinion. The court has accepted some of the parties' proposed redactions and has made additional redactions to the July 2, 2019 Opinion. Words which are redacted are reflected with the notation: "[redacted]."

**O P I N I O N**

**HORN, J.**

In the above-captioned, post-award bid protest, Safeguard Base Operations, LLC (Safeguard) challenges the award of a contract to B&O Joint Venture, LLC (B&O) under Solicitation No. HSFLGL-17-R-00001 (the Solicitation) by the United States Department of Homeland Security, Federal Law Enforcement Training Center (the Agency).

## FINDINGS OF FACT

Safeguard is a joint venture consisting of Safeguard Security Solutions, LLC (SSSL) and SRM Group, Inc. (SRM Group). Protestor contends that Safeguard is an 8(a)-eligible joint venture and a "leading provider of dormitory services." SSSL is the fifty-one percent owner of the Safeguard joint venture and is an 8(a)-eligible firm. SRM Group is the forty-nine percent owner of the Safeguard joint venture and currently is not 8(a)-eligible. B&O, the defendant-intervenor in this protest, is an 8(a) joint venture consisting of BPA Facility Services Inc. and Omni Corporation.

The parties have stipulated that, from June 2012 to October 2018, SRM Group provided to the Agency the services that were procured under the Solicitation. SRM Group's prior contract with the Agency, Contract No. HSFLGL-12-C-00006 (the SRM Group Contract), was awarded as an 8(a) contract. According to Agency contracting officer Sheryle Wood's October 29, 2018 statement of facts submitted to the United States Government Accountability Office (GAO) in response to a protest filed at the GAO by Safeguard,[2] SRM Group graduated from the 8(a) program on February 23, 2013.

On October 11, 2017, the Agency issued the Solicitation at issue in this Opinion, which was issued as a commercial item acquisition and was set-aside for 8(a)-eligible contractors. The Solicitation indicated that the contract to be awarded under the Solicitation would be a firm-fixed price contract for dormitory maintenance services to be provided at the Agency's training center in Glynco, Georgia, and would have "a base period of nine (9) months and seven (7) 12-month option periods." The Solicitation's performance work statement stated that the Agency's training center in Glynco, Georgia, has a lodging capacity of 2,093, that the Agency was responsible for training federal law enforcement officers, and that the Agency "is responsible for providing certain core instructional law enforcement programs as well as a variety of support services." The performance work statement also stated:

> The Contractor shall provide all labor, supplies, materials, equipment, including safety and protective gear, repair parts, tools, equipment, planning, scheduling and coordination, training, licenses, permits,

---

[2] As discussed below, based on the Agency's actions relating to award under the Solicitation, Safeguard has filed five protests with the GAO, one size protest with the Small Business Administration (SBA), and one override protest with the United States Court of Federal Claims, which was assigned to the undersigned and currently is on appeal at the United States Court of Appeals for the Federal Circuit.

certificates, insurance, pre-employment screening, reports and files, management, and supervision necessary to perform dormitory custodial, desk clerk, locksmith, and maintenance services for nine (9) dormitories, five (5) student centers, one (1) laundry center and other facilities as described throughout the Performance Work Statement (PWS).

The Solicitation provided that award under the Solicitation would be made on a best-value basis based on factors set forth in the Solicitation. As originally issued, the Solicitation stated that Factor A1 was management and technical approach, Factor A2 was hazardous waste management plan, Factor B was past performance, and Factor C was price. Amendment No. 3 to the Solicitation[3] added corporate experience of the prime contractor as a factor and changed the numbering of some of the factors to be evaluated under the Solicitation. Amendment No. 3 stated that Factor A2 was to become corporate experience of the prime contractor, and that hazardous waste management plan, which previously had been listed as Factor A2, was to become Factor A3. Factor A1 remained management and technical approach, Factor B remained past performance, and Factor C remained price. The Solicitation, as well as Amendment No. 3 to the Solicitation, indicated that, when combined, all non-price factors were approximately equal to price.

Section A of the Solicitation, titled "SECTION A SOLICITATION GENERAL INFORMATION," stated: "Pricing Schedule and Periods of Performance (POP) Service dates for each CLIN [Contract Item Line Number] are detailed in Section B. Note: Exceptions to line item structure in Section B may result in a bid not considered for award." (capitalization in original). The Solicitation also provided:

### SECTION B PRICE SCHEDULE

1. PERIOD OF PERFORMANCE (POP).  Service dates are as follows:

| Performance Period | Performance Period Dates |
|---|---|
| Base Period | 01/01/2018 thru 09/30/2018 |
| Option Period 1 | 10/01/2018 thru 09/30/2019 |
| Option Period 2 | 10/01/2019 thru 09/30/2020 |
| Option Period 3 | 10/01/2020 thru 09/30/2021 |
| Option Period 4 | 10/01/2021 thru 09/30/2022 |
| Option Period 5 | 10/01/2022 thru 09/30/2023 |
| Option Period 6 | 10/01/2023 thru 09/30/2024 |
| Option Period 7 | 10/01/2024 thru 09/30/2025 |

2. Phase-In Period. A phase-in period of two-weeks is planned and will commence after the post award conference meeting upon award of contract. There is no specific pricing line in the Schedule of Prices, however, pricing for this should be identified in the pricing volume. If there is no cost associated with phase-in, it should also be identified.

---

[3] As discussed below, the Agency issued five amendments to the Solicitation.

The Solicitation also contained what protestor refers to as an "'Order of Precedence' Clause," which stated:

> (s) *Order of precedence*. Any inconsistencies in this solicitation or contract shall be resolved by giving precedence in the following order: (1) the schedule of supplies/services; (2) The Assignments, Disputes, Payments, Invoice, Other Compliances, Compliance with Laws Unique to Government Contracts, and Unauthorized Obligations paragraphs of this clause; (3) the [Federal Acquisition Regulation (FAR)] clause at 52.212-5; (4) addenda to this solicitation or contract, including any license agreements for computer software; (5) solicitation provisions if this is a solicitation; (6) other paragraphs of this clause; (7) the Standard Form 1449; (8) other documents, exhibits, and attachments; and (9) the specification.

(capitalization and emphasis in original).

The Solicitation contained FAR clause 52.212-1, titled "Instruction to Offerors - Commercial Items," which stated that offers may be submitted on a government Standard Form (SF) 1449, and that offers "must show" "Price and any discount terms." (capitalization in original). FAR clause 52.212-1 in the Solicitation further stated:

> (g) *Contract award (not applicable to Invitation for Bids)*. The Government intends to evaluate offers and award a contract without discussions with offerors. Therefore, the offeror's initial offer should contain the offeror's best terms from a price and technical standpoint. However, the Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary. The Government may reject any or all offers if such action is in the public interest; accept other than the lowest offer; and waive informalities and minor irregularities in offers received.

(emphasis in original). The Solicitation also contained an addendum to FAR clause 52.212-1, which stated that an offeror's "[p]rice proposal shall include price for the phase-in period, base period and seven option periods." Moreover, the addendum to FAR clause 52.212-1 stated:

> Offerors shall provide a detailed breakdown of how it arrived at proposed costs as follows: Contract Line Item Number, Description, Service Contract Act (SCA) Occupation Code, Firm Fixed Price (FFP) Direct Labor Categories and Rates, for all proposed exempt and non-exempt positions; clearly identifying the proposed positions as exempt or non-exempt, full time equivalents for each labor category, productive hours, overtime hours and rate, exempt and non-exempt fringe benefits . . . .

\* \* \*

Price proposal shall include completed Schedule B. In the event there is a discrepancy between sections of the price proposal and Schedule B, Schedule B will govern.

The addendum to FAR clause 52.212-1 directed offerors to price proposals as Volume 3 and that:

**Volume 3 shall be labeled Factor C-Price** (Section B, to include price breakdown), SF 1449, SF30 Amendments, Section B price and price breakdown, required bond, completed HSAR clause at 3052.209-70, Prohibition on Contracts with Corporate Expatriates by checking pertinent block at paragraph (f) Disclosure and sign at end of clause (Section C Contract Clauses), completed FAR Clause 52.212-3 Representations and Certifications of this solicitation (Section E Solicitation Provisions).

(emphasis in original).

The Solicitation contained a modified version of FAR clause 52.212-2, titled "Evaluation - Commercial Items," which stated that the Agency "will evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement." (capitalization in original). An addendum to the modified version of FAR clause 52.212-2 in the Solicitation stated:

OFFERORS ARE ADVISED THAT THE GOVERNMENT INTENDS TO MAKE AWARD WITHOUT DISCUSSION OR ANY CONTACT CONCERNING THE PROPOSALS RECEIVED. Therefore, proposals should be submitted initially on the most favorable price and technical terms. Offeror should not assume that they will be contacted or afforded an opportunity to qualify, discuss, or revise their proposals.

(capitalization in original). The addendum further stated:

If the Government determines an award cannot be made without discussions, a competitive range determination will be made. . . . Should a competitive range be established, written or oral discussions may be conducted with all responsible offerors within the competitive range. However, the Government reserves the right to make an award without discussions based on initial proposals.

Regarding how the Agency would evaluate offerors' price proposals, the addendum to the modified version of FAR clause 52.212-2 in the Solicitation stated:

Evaluation of price will be conducted using one or more of the price analysis and/or cost realism techniques outlined in FAR 15.305 and 15.404. CO [contracting officer] reserves the right to conduct cost/price realism to assess performance risk resulting from unrealistically low offers. Price will

be evaluated to determine if the offeror's proposed price is fair and reasonable, complete, balanced and/or realistic.

As part of the price analysis, the government will evaluate its option to extend services (FAR Clause 52.217-8) by adding six months of the offeror's final option period price to the offeror's total price. This will result in the total evaluated price by which the determination cited under f. (1) will be based, in part.

Offeror is required only to price the base and option periods.

The addendum to the modified version of FAR clause 52.212-2 defined "**Completeness/Accuracy**" as "[t]he offeror's proposal is in compliance with the Price Volume instructions in the solicitation." (emphasis and capitalization in original).

The Solicitation included a government SF 1449, titled "SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS," and a government Optional Form (OF) 336, titled "CONTINUATION SHEET." (capitalization in original). The "SCHEDULE OF SUPPLIES/SERVICES" begins in block 20 on the SF 1449 and continues throughout column "(B)" on the OF 336, which the parties have referred to as "Schedule B." (capitalization in original). The Schedule of Supplies/Services on the SF 1449 and OF 336 contained CLINs for the base period of performance, as well as the seven one-year option periods of performance. For example, CLINs 0005 and 0006, which were to be performed during the base period of performance, were listed as:

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED HSFLGL-17-R-00001 | | | | PAGE 4 | OF 231 |
|---|---|---|---|---|---|---|
| NAME OF OFFEROR OR CONTRACTOR | | | | | | |
| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) | |
| 0005 | Routine Maintenance Requisition No: 18SSD0026A | 9 | MO | | | |
| 0006 | Locksmith Services Requisition No: 18SSD0026A | 9 | MO | | | |

CLINs in option periods of performance were designated by inserting the number of the option period of performance into the beginning of the CLIN in place of the first zero. Thus, CLINs 1005 and 1006 were to be performed during the first option period of performance and were listed as:

| 1005 | Routine Maintenance (Option Line Item) 10/01/2018 | 12 | MO | | |
|---|---|---|---|---|---|
| 1006 | Locksmith Services (Option Line Item) 10/01/2018 | 12 | MO | | |

At issue in the above-captioned bid protest are the CLINs designated as 0007AA and 0007AB in the base period of performance, as well as the CLINs in the option periods of performance which correspond with CLINs 0007AA and 0007AB. The full list of the sixteen CLINs at issue in this case are: 0007AA, 1007AA, 2007AA, 3007AA, 4007AA, 5007AA, 6007AA, 7007AA, 0007AB, 1007AB, 2007AB, 3007AB, 4007AB, 5007AB, 6007AB, and 7007AB.[4] In the paragraph preceding the CLINs for the base period of performance, the Solicitation stated that "CLIN 0007aa and 0007ab are pre-priced and performed as authorized by the Contracting Officer. The amounts listed for these CLINS are a 'not to exceed' amount with no guarantee that the total amount will be used." As indicated in the image on the following page, in the Solicitation, CLINs 0007AA and 0007AB were listed as:

---

[4] When discussing CLINs 0007AA, 1007AA, 2007AA, 3007AA, 4007AA, 5007AA, 6007AA, and 7007AA, the parties have used, and the court will use in this Opinion, the shorthand X007AA. When discussing CLINs 0007AB, 1007AB, 2007AB, 3007AB, 4007AB, 5007AB, 6007AB, and 7007AB, the parties have used, and the court will use in this Opinion, the shorthand X007AB. Thus, CLINs X007AA and X007AB refers to CLINs 0007AA, 1007AA, 2007AA, 3007AA, 4007AA, 5007AA, 6007AA, 7007AA, 0007AB, 1007AB, 2007AB, 3007AB, 4007AB, 5007AB, 6007AB, and 7007AB.

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| 0005 | Routine Maintenance<br>Requisition No: 18SSD0026A | 9 | MO | | |
| 0006 | Locksmith Services<br>Requisition No: 18SSD0026A | 9 | MO | | |
| 0007AA | Service Work Requests – Maintenance<br><br>MATERIAL REIMBURSEMENT FOR SERVICE WORK REQUKSTS, INTERNAL ORDERS, AND OVER AND ABOVE ORDERS.<br><br>*****DO NOT SUBMIT PRICING FOR THESE CLINS*****<br><br>These CLINS shall be performed on a fixed price basis and used with service work requests, internal orders, and over-and-above orders placed against this contract. The materials are paid at cost incurred as evidenced by a vendor/supplier billing for determination of fair and reasonableness of price. Material handling costs associated with this portion of the contract will be on case-by-case basis. The amount listed is the Government "Ceiling" and is a "not-to-exceed" amount with no guarantee that this amount will be used. The amount provided is shown as a lump sum; however, this does not mean that the contractor will be paid a lump sum. The contractor shall not exceed the "Ceiling" amount without prior approval of the Contracting Officer in writing. The Government will not be liable for any costs in excess of this amount unless such prior approval has been obtained. Payment will be made monthly as work is completed. Labor costs should be included under CLIN 0003.<br>Requisition No: 18SSD0026A | 1 | LO | | |
| 0007AB | Service Work Requests – DIRECT EQUIPMENT<br><br>DIRECT EQUIPMENT REPLACEMENT – COST REIMBURSEMENT<br><br>*****DO NOT SUBMIT PRICING FOR THESE CLINS*****<br><br>This CLIN is for reimbursement, at cost, for replacement equipment such as TVs, VCR/DVD,<br>Continued ... | 1 | LO | | |

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | microwaves, coffee pots, hair dryers, refrigerators and other items determined by Government to be beyond repair. The contractor will be required to replace the unit with same or similar type when authorized in advance by the Contracting Officer. The contractor must conduct price analysis to determine that the prices are considered fair and reasonable. Evidence of such price analysis must be included with the work request for Government approval. Reimbursement will be at cost incurred by the contractor via invoices with vendor/supplier billing or receipts attached. No other overhead, G&A, or profit will be allowed. The amount listed is a "Not-to-Exceed" amount with no guarantee that this amount will be used. The contractor shall not exceed this amount without prior approval of the Contracting Officer in writing. The Government will not be liable for any costs in excess of this amount unless such prior approval has been obtained. Payment will be made monthly as work is completed.<br>Requisition No: 18SSD0026A<br><br><br>SUBTOTAL CLINS 0001 THROUGH 0007AB = | | | | |

The Solicitation, however, did not "list[]" a unit price, a government "[c]eiling" amount, or a government not-to-exceed amount for either CLIN 0007AA or CLIN 0007AB.

> The descriptions of CLINs 10007AA, 20007AA, 30007AA, 40007AA, 50007AA, 60007AA, and 70007AA contained the same language as in the description of CLIN 0007AA. The description of CLINs 1007AB, 2007AB, 3007AB, 4007AB, 5007AB, 6007AB, and 7007AB contained the same language as in the description of CLIN 0007AB. Before each option period of performance, the Solicitation stated that the CLINs in that option period of performance associated with CLINs X007AA and X007AB "are pre-priced and performed as authorized by the Contracting Officer. The amounts listed for these CLINS are a 'not to exceed' amount with no guarantee that the total amount will be used." The Solicitation, however, did not provide a unit price, a government "[c]eiling" amount, or a government not-to-exceed amount for CLINs 1007AA, 2007AA, 3007AA, 4007AA, 5007AA, 6007AA, 7007AA, 1007AB, 2007AB, 3007AB, 4007AB, 5007AB, 6007AB, or 7007AB.

After the Agency issued the October 11, 2017 Solicitation, the parties jointly have stipulated:

> On October 20, 2017, Safeguard protested DHS's [the Department of Homeland Security's] decision to include requirements that exceeded the Agency's needs. This protest was docketed as Matter No. B-415588.1. Safeguard filed a second pre-award protest, docketed as Matter No. B-415588.2. Both pre-award protests were dismissed as academic on November 21, 2017 when DHS announced that it would take corrective action that remedied the infirmities Safeguard identified.

(internal references omitted). On February 8, 2018, the Agency issued Amendment No. 3 to the Solicitation, which contained answers from the Agency to 272 questions posed by potential offerors.[5] Question and answer 9 in Amendment No. 3 stated:

---

[5] On October 23, 2017, the Agency issued Amendment No. 1 to the Solicitation, which stated that the purpose of Amendment No. 1 was to correct typographical errors in the Solicitation. On November 2, 2017, the Agency issued Amendment No. 2 to the Solicitation, which indicated that the purpose of Amendment No. 2, temporarily, was to cancel the date for receipt of proposals due to a large amount of questions received by the Agency related to the Solicitation. On February 22, 2018, the Agency issued Amendment No. 4 to the Solicitation, which stated that the Agency had received additional questions and planned on providing responses to those questions. On February 26, 2018, the Agency issued Amendment No. 5 to the Solicitation, which answered questions posed by potential offerors and made revisions to the Solicitation in response to the received questions.

9.   **Q: Section B Price Schedule:** Schedule B – CLIN X007AA & X007AB: These
CLINs state "The amount listed is the Government "Ceiling" and is a "not-to-exceed"
amount", however there are no amounts listed.  What are the not-to-exceed amounts
for these CLINs?
**A: For bidding purposes please include the following "not-to-exceed" amounts in
the applicable CLIN:**

| CLIN | AMOUNT | CLIN | AMOUNT | CLIN | AMOUNT |
|------|--------|------|--------|------|--------|
| 0007AA | $124,688.00 | 3007AA | $549,872.00 | 6007AA | $636,546.00 |
| 0007AB | $  59,063.00 | 3007AB | $260,466.00 | 6007AB | $301,522.00 |
| 1007AA | $498,750.00 | 4007AA | $577,366.00 | 7007AA | $636,546.00 |
| 1007AB | $236,250.00 | 4007AB | $273,489.00 | 7007AB | $301,522.00 |
| 2007AA | $523,688.00 | 5007AA | $606,234.00 | | |
| 2007AB | $248,063.00 | 5007AB | $287,163.00 | | |

(emphasis in original). The parties have correctly stipulated that the amounts listed in answer 9 for CLINs X007AA and X007AB, when added together for the base period of performance and for all option periods of performance, totals $6,121,228.00. Question and answer 16 stated:

16.   **Q: Section B Price Schedule:** Will the Government provide a ceiling number for CLINS XXX7AB to be included for submission in Volume 3-Price?
**A: See response to Question 9.**

(emphasis in original).

Amendment No. 3 also amended a section of the Solicitation with a heading that stated "SECTION B PRICE SCHEDULE," which was changed to state:

**SECTION B PRICE SCHEDULE**

1.   PERIOD OF PERFORMANCE (POP).  Service dates are as follows:

| Performance Period | Performance Period Dates |
|--------------------|--------------------------|
| Base Period | 07/01/2018 thru 09/30/2018 |
| Option Period 1 | 10/01/2018 thru 09/30/2019 |
| Option Period 2 | 10/01/2019 thru 09/30/2020 |
| Option Period 3 | 10/01/2020 thru 09/30/2021 |
| Option Period 4 | 10/01/2021 thru 09/30/2022 |
| Option Period 5 | 10/01/2022 thru 09/30/2023 |
| Option Period 6 | 10/01/2023 thru 09/30/2024 |
| Option Period 7 | 10/01/2024 thru 09/30/2025 |

2.   Phase-In Period. A phase-in period of one month is planned for June 1-30, 2018.  CLIN 0001AA shall reflect all cost associated with this phase in.  If there is no cost associated with phase-in, it should be identified at CLIN 0001AA as Zero dollars or No Cost (NC).

(capitalization and highlight in original). The highlighted language in the above-image reflects the language that was changed or added by Amendment No. 3 to the Solicitation.

10

On March 16, 2018, the Agency received seven proposals in response to the Solicitation from seven offerors, including Safeguard and B&O. In B&O's proposal, B&O provided unit prices and amounts for CLINs 0007AA, 1007AA, 2007AA, 3007AA, 4007AA, 5007AA, 6007AA, 7007AA, 0007AB, 1007AB, 2007AB, 3007AB, 4007AB, 5007AB, 6007AB, and 7007AB in accordance with the amounts the Agency provided for those sixteen CLINs in response to question 9 in Amendment No. 3. For example, B&O's proposal provided:

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED HSFLGL-17-R-00001/0003 | | | PAGE 7 | OF 297 |
|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
B&O Joint Venture, LLC

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| 0007AA | Service Work Requests - Maintenance | 1 | LO | $124,688.00 | $   124,688.00 |
| | MATERIAL REIMBURSEMENT FOR SERVICE WORK REQUESTS. *****DO NOT SUBMIT PRICING FOR THESE CLINS***** | | | | |
| | These CLINS shall be performed on a fixed price basis and used with service work requests placed against this contract.  The materials are paid at cost incurred as evidenced by a vendor/supplier billing for determination of fair and reasonableness of price.  Material handling costs associated with this portion of the contract will be on case-by-case basis.  The amount listed is the Government "Ceiling" and is a "not-to-exceed" amount with no guarantee that this amount will be used.  The amount provided is shown as a lump sum; however, this does not mean that the contractor will be paid a lump sum.  The contractor shall not exceed the "Ceiling" amount without prior approval of the Contracting Officer in writing. The Government will not be liable for any costs in excess of this amount unless such prior approval has been obtained.  Payment will be made monthly as work is completed.  Labor costs should be included under CLIN 0004 or 0005. | | | | |
| | Delivery: 09/30/2018 Delivery Location Code: FLETC GL DEPARTMENT OF HOMELAND SECURITY FEDERAL LAW ENFORCEMENT TRNG CTR 1131 CHAPEL CROSSING RD ATTN:   BLDG: GLYNCO GA 31524 | | | | |
| | Change Item 0007AB to read as follows (amount shown is the total amount): | | | | |
| 0007AB | Service Work Requests - DIRECT EQUIPMENT | 1 | LO | $ 59,063.00 | $   59,063.00 |
| | DIRECT EQUIPMENT REPLACEMENT - COST REIMBURSEMENT *****DO NOT SUBMIT PRICING FOR THESE CLINS***** | | | | |
| | This CLIN is for reimbursement, at cost, for replacement equipment such as TVs, VCR/DVD, microwaves, coffee pots, hair dryers, refrigerators and other items determined by Government to be beyond repair.  The contractor will be required to replace the unit with the same or Continued … | | | | |

B&O's proposal stated that B&O's total proposed price for the base period of performance and all option periods of performance was $79,105,840.96. B&O's proposal included a chart titled "CLIN Summary," which provided a breakdown of prices per CLIN in each period of performance. B&O included the government provided ceiling or not-to-exceed amounts for CLINs X007AA and X007AB, which were provided in question and answer 9 in Amendment No. 3. For instance, B&O's proposal included the following chart for the first option period of performance:

[redacted]

The amounts listed for CLINs 1007AA and 1007AB are consistent with the amounts provided in the Agency's answer to question 9 in the Amendment No. 3.

In Safeguard's proposal, Safeguard did not include amounts for CLINs 0007AA, 1007AA, 2007AA, 3007AA, 4007AA, 5007AA, 6007AA, 7007AA, 0007AB, 1007AB, 2007AB, 3007AB, 4007AB, 5007AB, 6007AB, and 7007AB. For those sixteen CLINs, Safeguard left the "UNIT PRICE" and "AMOUNT" blank. Safeguard's proposal for CLINs X007AA and X007AB, therefore, appeared as:

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| 0007AA | Service Work Requests - Maintenance | 1 | LO | | |

As indicated in the above image, Safeguard did not list any amount under the "UNIT PRICE" or "AMOUNT" columns for CLINs X007AA and X007AB. (capitalization in original).

Safeguard's proposal included a chart indicating that Safeguard's total proposed price for the base period of performance and all option periods of performance was [redacted]. The chart in Safeguard's proposal indicated Safeguard's pricing for each CLIN in each period of performance. Safeguard's chart, however, did not include pricing for CLINs X007AA or X007AB. Rather, Safeguard's chart provided as follows:

[redacted]

As indicated in the above image, Safeguard did not submit prices for "SWR [service work requests] - Maintenance" or "SWR Direct Equipment" for the base period of performance and for all seven option periods of performance.[6] Safeguard's total proposed price for the base period of performance and all option periods of performance, therefore, did not include the government provided ceiling or not-to-exceed amounts for CLINs 0007AA, 1007AA, 2007AA, 3007AA, 4007AA, 5007AA, 6007AA, 7007AA, 0007AB, 1007AB, 2007AB, 3007AB, 4007AB, 5007AB, 6007AB, and 7007AB.

According to an Agency document titled "SOURCE SELECTION PLAN," which was dated March 2, 2018, Joseph Williams was to serve as the Agency's source selection authority for the procurement under the Solicitation and was to make the "final source selection decision." (capitalization in original). Joseph Williams also was responsible for approving any course of action involving the establishment of a competitive range or discussions. The Agency's Source Selection Plan identified Sheryle Wood as the contracting officer for the procurement and stated that, in her role as contracting officer,

---

[6] Safeguard's chart incorrectly lists "SWR Direct Equipment" as CLINs "7AA," instead of CLINs "7AB."

Ms. Wood was responsible for deciding whether to establish a competitive range and whether to conduct discussions with offerors in the competitive range, subject to Joseph Williams' approval. The Agency's Source Selection Plan indicated that Sheryle Wood also would serve as the source selection evaluation board chairperson. As the source selection evaluation board chairperson, Sheryle Wood was to manage "the overall activities of the SSEB [source selection evaluation board], distributing the workload, and ensuring compliance with source selection information security procedures." The Agency's Source Selection Plan indicated that the source selection evaluation board would consist of the following three evaluation boards:

| Evaluation Board | Name/Division | Role |
| --- | --- | --- |
| Technical Evaluation Board (TEB) | Luke Rhaney, Contract Compliance Specialist, SSD | Lead |
| Past Performance Evaluation Board (PPEB) | Mike Harris, Program Analyst, SSD | Lead |
| Price Evaluation Board (PEB) | Sheryle Wood, Contracting Officer, PRO | Lead |

The Agency's Source Selection Plan identified James Caine, an attorney advisor in the defendant Agency's Office of Chief Counsel, as the legal counsel for the procurement under the Solicitation. As legal counsel, James Caine was to provide legal advice to the source selection authority, Joseph Williams, and to the source selection evaluation board. James Caine was to be a non-voting member of the source selection evaluation board and was to "not participate in the caucus process unless specifically asked to do so by the board Leader." Regarding the Agency's evaluation process, the Source Selection Plan indicated, multiple times, that the Agency intended to award a contract under the Solicitation without discussions and based on the initial proposals received in response to the Solicitation.

On March 22, 2018, Sheryle Wood completed a document with the subject "Price Evaluation Report." In the Price Evaluation Report, Sheryle Wood determined that four of the seven offerors, including Safeguard, had failed to include the government provided amounts listed for CLINs X007AA and X007AB in the proposals, which were provided in the Agency's answer to question 9 in Amendment No. 3 to the Solicitation. Regarding Safeguard's proposal, Sheryle Wood stated that "[t]he correct pricing schedule (Section B, Amendment 0003) and the correct estimated quantities were used; however, the specific data to CLINS XXX7 AA and XXX7 AB were [sic] not plugged in for all years as instructed by Amendment 0003." Sheryle Wood asserted:

> It is recommended that the Contracting Officer determine the [Safeguard's] price fair and reasonable as presented without need for discussion or exchanges with regard to price. Once the competitive range has been established, it is recommended that Safeguard Base Operations LLC (SBO) be retained in the competitive range for purposes of discussion. Calculation errors in all years, inclusion of the IDIQ data all years, and full breakdown of phase in costs and ODCs [other direct costs] would be the discussion element [sic] all years.

In the section of the March 22, 2018 Price Evaluation Report concerning B&O's proposal, Sheryle Wood stated that "[t]he correct pricing schedule (Section B, Amendment 0003) and the correct estimated quantities were used and the specific data to CLINS XXX7AA and XXX7AB were plugged in for all years as instructed by Amendment 0003." Sheryle Wood, therefore, indicated that B&O had included in its proposal the government provided amounts for CLINs X007AA and X007AB, which were provided in Amendment No. 3 to the Solicitation. Sheryle Wood also stated that she

> recommended that the Contracting Officer determine the price fair and reasonable as presented without need for discussion or exchanges with regard to price. Once the competitive range has been established, it is recommended that B&O Joint Venture LLC be retained in the competitive range for purposes of discussion. Calculation errors would be the discussion element all years.

Moreover, at the end of the March 22, 2018 Price Evaluation Report, Sheryle Wood stated:

[redacted]

In the chart immediately above, Safeguard is listed as "SBO JV." As indicated for the purposes of the immediately above chart, Sheryle Wood increased Safeguard's "Price as Submitted" of [redacted] to a "Total evaluated with IDIQ lines/corrections" of [redacted]. (capitalization in original). Sheryle Wood, however, recommended that Safeguard be retained in a competitive range if a competitive range was to be established.

On April 9, 2018, the Agency completed its past performance evaluation of the seven offerors, which Michael Harris, chairperson of the past performance evaluation board, documented in a memorandum with a subject of "Past Performance Evaluation Board Report." In the Past Performance Evaluation Board Report, Michael Harris summarized the offerors' proposals and identified the strengths, weaknesses, and deficiencies of all seven offerors. Under a section titled "Recommendation," Michael Harris stated:

[redacted]

On June 22, 2018, Luke Rhaney completed a memorandum with a subject of "Technical Evaluation of Proposals Submitted in Response to RFP [request for proposals]." The Technical Evaluation of Proposals document stated that the "following analysis findings are presented in part, per individual offer for non-price factors A1, Management and Technical Approach; Factor A2, Corporate Experience of the Prime Contractor, and Factor A3, Hazardous Waste Management Plan (HWMP) which were reviewed individually by the Technical Evaluation Team followed by a consensus rating." According to the June 22, 2018 Technical Evaluation of Proposals document, the technical evaluation board reached the following conclusions:

14

[redacted]

(emphasis in original). The Technical Evaluation of Proposals document stated that "award could be made to the following offeror's [sic] listed in order of ranking" and included the following chart:

[redacted]

On June 8, 2018, the source selection authority, Joseph Williams, completed a "Source Selection Decision Document," which stated that the Agency had elected neither to establish a competitive range nor to hold discussions with offerors, and that Joseph Williams had determined that B&O's proposal provided the best value to the government. Regarding Safeguard's proposal, Joseph Williams stated:

> The price proposal [submitted by Safeguard] did not comply with instructions, containing .pdf copies of their spreadsheets rather than in excel as required, errors in pricing of extended amounts for all years, and omission of the IDIQ pricing (as required by RFP amendment). There is no yearly escalation except for the project management CLINs. (All other proposals include escalation of at least [redacted] for all CLINs, which the history of the current contract supports.) Their proposed price of [redacted] is the third lowest and although it is reasonable, it may be considered unrealistically low compared to the IGE. After accounting for errors and adding escalation to all CLINs, their total evaluated price increased by approximately [redacted] to [redacted] (without accounting for the floor cleaning services that were to be at no expense to the Government). [redacted] evaluated prices that are realistic, and awarding to this offeror presents some risk to the Government without a completely revised price proposal accounting for all costs, and given their Technical Approach and Corporate Experience ratings are lower than other offerors.
>
> Because of a non-compliant price proposal, and a price that is unrealistically low, this proposal should have been eliminated from the competition without a technical evaluation.

In his June 8, 2018 Source Selection Decision Document, Joseph Williams determined that B&O's proposal provided the best value to the government. Joseph Williams asserted that "*Prosperitus and B&O Joint Venture are the only two offers that could be awarded a contract without discussions. Of these two, B&O's non-price factor ratings are higher and their total evaluated price is approximately $11M less, making them the better value to the Government.*" (emphasis in original). According to Joseph Williams, "[*d*]*iscussions and a substantial update to portions of their* [Safeguard's] *technical proposal as well as a completely revised price proposal would be necessary, but it is unlikely they would become much more competitive*." (emphasis in original).

On June 14, 2018, the Agency sent a pre-award notice to Safeguard indicating that the Agency had selected B&O as the "apparent successful offeror" under the Solicitation. On June 15, 2018, Safeguard requested a debriefing. In a memorandum dated June 15, 2018, which was signed by Sheryle Wood, the Agency provided Safeguard with a written debriefing in response to Safeguard's request for a debriefing. Regarding Safeguard's price proposal, in the June 15, 2018 memorandum, Sheryle Wood stated:

> Four (4) deficiencies noted: (1) failure to breakout all ODCs; (2) 7-day phase in costs of $200,000 not broken down in the price proposal; (3) Amendment 0003 instructed offerors to plug in specific data to CLINS 7AA and 7AB in all years which Safeguard did not; (4) errors in pricing of extended amounts for all years. There was a modest escalation in the project management CLIN in the out years only.

> The total price of [redacted] as submitted is significantly lower than the Independent Government Estimate (IGE) and is considered unrealistically low.[7] After including the missing CLIN data, correcting for errors as mentioned above, and adding a reasonably modest [redacted] escalation for all CLINs (as supported by the history of the current contract), the total evaluated price increased by approximately [redacted] to [redacted]. The total evaluated price is more realistic, but it is still well below the IGE and presents a slight performance risk.

Sheryle Wood further stated that, "[i]n an effort to improve proposal submissions for future projects, it is imperative that you follow the proposal submission requirements exactly, while paying close attention to the language describing what the Government will be evaluating under each factor and subfactor."

---

[7] In his June 8, 2018 Source Selection Decision, Joseph Williams stated:

> Their [Safeguard's] proposed price of [redacted] is the third lowest and although it is reasonable, it may be considered unrealistically low compared to the IGE. After accounting for errors and adding escalation to all CLINs, their total evaluated price increased by approximately [redacted] to [redacted] (without accounting for the floor cleaning services that were to be at no expense to the Government).

Joseph Williams also stated in the June 8, 2018 Source Selection Decision Document that, "[b]ecause of a non-compliant price proposal, and a price that is unrealistically low, this [Safeguard's] proposal should have been eliminated from the competition without a technical evaluation."

The parties have stipulated that Safeguard filed its third protest at the GAO concerning award under the Solicitation on June 21, 2018.[8] The parties' joint stipulations of fact in this court states that Safeguard's third protest "challenged DHS's decision to assign Safeguard a 'deficiency' for offering a no-charge benefit to DHS and selection of B&O as the awardee." On July 16, 2018, the Agency indicated that it would take corrective action and would have source selection authority Joseph Williams reconsider the evaluation results and render a new award decision. On July 19, 2018, the GAO dismissed Safeguard's third protest as "academic."

Thereafter, Joseph Williams appears to have undertaken a reevaluation of the proposals received in response to the Solicitation and to have documented his reevaluation in a new Source Selection Decision Document, which is dated August 2, 2018. In the August 2, 2018 Source Selection Decision Document, Joseph Williams raised Safeguard's rating for subfactor A1-2, concerning Safeguard's technical approach, from its previous rating of unsatisfactory to marginal. Regarding Safeguard's price proposal, Joseph Williams indicated that Safeguard had "omitted the IDIQ pricing (as required by RFP amendment)," and that, "[a]fter accounting for errors and adding escalation to all appropriate CLINs, their total evaluated price increased by approximately [redacted]." According to Joseph Williams, "[b]ecause of a non-compliant price proposal with a questionable low price, and Corporate Experience and Past Performance volumes that were submitted without discerning between the prime and sub-contractors in the joint venture, this proposal could have been eliminated from the competition without a technical evaluation." Joseph Williams concluded, again, that B&O and Prosperitus Solutions were the only two offerors which could be awarded a contract under the Solicitation without discussions, and that B&O's proposal provided the best-value to the government and should be selected for award.

On August 7, 2018, the Agency awarded Contract No. 70LGLY18CGLB00003 (the B&O Contract) to B&O. Also on August 7, 2018, the Agency sent a post-award notice to Safeguard advising Safeguard that the Agency had awarded the B&O Contract to B&O. In a written debriefing provided to Safeguard dated August 14, 2018, the Agency stated:

> The price proposal also contained errors, though not technically rated as weaknesses or deficiencies. ODCs were not fully identified as required, although they were projected in the cost allocation of the proposal. Although spreadsheets with pricing information were included, some were submitted in .pdf format rather than Excel as required. Errors in pricing of extended amounts in all years were discovered, and the pricing for the IDIQ CLINs (XXX7AA and XXX7AB) were omitted. Further, [redacted] was proposed for

---

[8] Additionally, according to Sheryle Wood's October 29, 2018 contracting officer's statement of facts submitted to the GAO and included in the administrative record in the above-captioned protest, Safeguard had filed a size protest with the SBA concerning the size of B&O on June 18, 2018. In the October 29, 2018 contracting officer's statement of facts submitted to the GAO, Sheryle Wood states that the SBA denied Safeguard's size protest on July 20, 2018.

the project management CLIN only, when all other proposals included escalation on all appropriate CLINs-which is supported by the history of the current contract. Therefore, after accounting for errors, omissions and escalations, the total evaluated price increased by approximately $6.2M.

The Agency also stated:

Although SBO did not receive any unsatisfactory ratings, discussions leading to substantial updates to portions of the technical proposal and past performance volume, as well as a revised price proposal would be necessary to be more competitive. The successful offeror submitted the most complete and sound technical proposal with no deficiencies and several strengths identified by the technical evaluation team, resulting in receiving the highest non-price factor ratings. They also submitted one of only two compliant and complete price proposals without errors. Because of their superior ratings and the identified strengths, demonstrated relevant past efforts and performance of the prime contractor, and a complete submitted price that is reasonable and realistic, the price premium over SBO's total evaluated price is justified for the assurance of superior services when spread over the life of a seven-year contract.

On August 20, 2018, Safeguard filed its fourth protest involving award under the Solicitation at the GAO. In its fourth protest at the GAO, Safeguard argued that the Agency arbitrarily and capriciously evaluated Safeguard's past performance, did not correctly justify the price premium associated with B&O's proposal, and that the Agency's "actions are biased against Safeguard." Safeguard also argued:

DHS's Post Award Debriefing cites purported errors in Safeguard's proposal with respect to pricing of extended amounts in all years, and states that the pricing for the IDIQ CLINs (XXX:7AA and XXX:7AB) were omitted. However, these CLINS were not required to be priced per the RFP. Rather, they were costs that the Agency was to reimburse the contractor. It is our understanding and alleged in this protest that the other offerors did not include pricing for these CLINS either. Therefore, it would be arbitrary and capricious for the Agency to fail to apply the same the evaluation criteria and scoring method to the awardee's proposal.

(citation omitted). On August 24, 2018, Safeguard filed an amended protest at the GAO, which asserted that the Agency had violated FAR § 15.404-1(d)(3) by increasing the price of Safeguard's proposal during the Agency's evaluations. The regulation at FAR § 15.404-1(d)(3) (2019), which has not been altered since January 13, 2017, states:

Cost realism analyses may also be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience

indicates that contractors' proposed costs have resulted in quality or service shortfalls. Results of the analysis may be used in performance risk assessments and responsibility determinations. However, proposals shall be evaluated using the criteria in the solicitation, and the offered prices shall not be adjusted as a result of the analysis.

See FAR § 15.404-1(d)(3). In its August 24, 2018 amended protest, Safeguard also argued:

> [T]he Solicitation did not require offerors to price IDIQ CLINs (XXX:7 AA and XXX:7 AB), so Safeguard did not err in omitting such pricing. Moreover, Safeguard believes other offerors also did not price these CLINs. To the extent DHS upwardly adjusted only Safeguard's proposed price in connection with these CLINs, DHS clearly engaged in disparate treatment. The magnitude of the upward adjustment attributable to these CLINs remains unclear, but it also would appear to be but a fraction of the total adjustment of $6.2 million. Thus, it seems that DHS has effected further undisclosed, and erroneous, adjustments to Safeguard's proposed firm-fixed price.

On August 28, 2018, James Caine, Agency counsel, sent a letter to the GAO stating that, after reviewing Safeguard's August 20, 2018 protest and August 24, 2018 amended protest at the GAO, the Agency had "discovered" that it had made mistakes when evaluating the proposals received in response to the Solicitation and was going to take corrective action to correct the mistakes by making a new source selection decision. On August 31, 2018, the GAO dismissed Safeguard's August 20, 2018 protest and August 24, 2018 amended protest.

On September 20, 2018, source selection authority Joseph Williams completed his third Source Selection Decision Document. The September 20, 2018 Source Selection Decision Document provided:

[redacted]

Regarding Pleiades Group LLC (Pleiades Group), the September 20, 2018 Source Selection Decision Document stated Pleiades Group's price proposal lacked substantive information, incorrectly priced cleaning rates on a monthly basis as opposed to a daily basis, and "does not contain any totals per year or any grand totals. Additionally, their price volume failed to include government provided amounts for the Service Work Request CLINs, as required by Amendment 3 to the solicitation. Therefore, this offeror is not eligible for award." The September 20, 2018 Source Selection Decision Document asserted that Ravi, Inc.'s price proposal did not include a "detailed cost breakdown," contained incorrect "calculation totals," and "failed to include government provided amounts for the Service Work Request CLINs, as required by Amendment 3 to the solicitation. Therefore, this offeror is not eligible for award."

According to the September 20, 2018 Source Selection Decision Document, Prosperitus Solutions' "price proposal was technically non-compliant because their price volume failed to include government provided amounts for the Service Work Request CLINs, as required by Amendment 3 to the solicitation. Therefore, this offeror is not eligible for award." Likewise, regarding Safeguard's proposal, the September 20, 2018 Source Selection Decision Document stated that Safeguard's "price proposal was technically non-compliant because their price volume failed to include government provided amounts for the Service Work Request CLINs, as required by Amendment 3 to the solicitation. Therefore, this offeror is not eligible for award."

On September 20, 2018, the Agency sent Safeguard a post-award notice stating that the Agency had selected B&O for award under the Solicitation. The September 20, 2018 post-award notice also stated:

(v)   In general terms, Safeguard Base Operations' (SBO) price proposal was determined non-compliant because the price volume failed to include government provided amounts for the Service Work Request CLINs, which was required by Amendment 00003 to the solicitation. The government response to Question Number 9 specifically stated:" A. For bidding purposes please include the following "not-to-exceed" amounts in the applicable CLIN:

| CLIN | AMOUNT | CLIN | AMOUNT | CLIN | AMOUNT |
|------|--------|------|--------|------|--------|
| 0007AA | $124,688.00 | 3007AA | $549,872.00 | 6007AA | $636,546.00 |
| 0007AB | $ 59,063.00 | 3007AB | $260,466.00 | 6007AB | $301,522.00 |
| 1007AA | $498,750.00 | 4007AA | $577,366.00 | 7007AA | $636,546.00 |
| 1007AB | $236,250.00 | 4007AB | $273,489.00 | 7007AB | $301,522.00 |
| 2007AA | $523,688.00 | 5007AA | $606,234.00 | | |
| 2007AB | $248,063.00 | 5007AB | $287,163.00 | | |

The solicitation further specifically stated the following: "Exceptions to the line item structure in Section B may result in a bid not considered for award." Therefore, Safeguard Base Operations LLC-JV is not eligible for award.

On September 25, 2018, Safeguard filed its fifth bid protest at the GAO, which asserted that the Agency had acted arbitrarily and capriciously by not considering Safeguard's proposal because "the Solicitation did not require offerors to price IDIQ CLINs (XXX:7 AA and XXX:7 AB), so Safeguard did not err in omitting such pricing." On October 12, 2018, Safeguard filed a supplemental protest at the GAO asserting that the Agency had acted arbitrarily and capriciously because "the current DHS value of B&O's award at $77,734,857 is in fact $1.36 million ***LESS*** than the DHS value of the award per the August 14, 2018 debriefing notice given to Safeguard indicating B&O's pricing at $79,095,987—despite no opportunity for revised pricing extended to all offerors." (capitalization and emphasis in original).

After Safeguard had filed its September 25, 2018 protest at the GAO, the Agency overrode the automatic stay to performance of the B&O Contract required by the Competition in Contracting Act (CICA), 31 U.S.C. § 3553 (2012), due to Safeguard's

September 25, 2018 protest filed at the GAO. See Safeguard Base Operations, LLC v. United States, 140 Fed. Cl. 670, 679-83 (2018). On September 30, 2018, SRM Group's incumbent dormitory maintenance services contract with the Agency expired. Id. at 680. On October 1, 2018, the Agency transitioned to B&O's Contract in order for B&O to provide dormitory maintenance services. Id. Also on October 1, 2018, Safeguard filed a bid protest challenging the Agency's decision to override the CICA stay at the United States Court of Federal Claims, which was docketed as Safeguard Base Operations, LLC v. United States, Case No. 18-1515C, and was assigned to the undersigned.[9] See id. On October 24, 2018, the court issued an oral decision on the override complaint denying Safeguard's protest, and, on October 25, 2018, the court issued a written decision memorializing the court's October 24, 2018 oral decision and directed the Clerk of the United States Court of Federal Claims to enter judgment. See id. at 680, 710. Thereafter, Safeguard appealed the court's October 25, 2018 Opinion and judgment to the United States Court of Appeals for the Federal Circuit, which currently remains pending.

On December 14, 2018, the GAO issued a decision denying Safeguard's fifth protest at the GAO. See Safeguard Base Operations, LLC, B-415588.6, et al., 2018 WL 6617289, at *1 (Dec. 14, 2018). In its December 14, 2018 decision, the GAO stated:

> Safeguard asserts that the solicitation did not provide that a proposal could be rejected for not including the reimbursable CLINs, and therefore the agency's actions were unreasonable. While we agree with the protester that the omitted price information is relatively trivial, we consider the source of the controversy to be Safeguard's failure to review the amendment thoroughly, as opposed to any conduct attributable to the agency. Indeed, if Safeguard had reviewed the amendment, then it would have recognized that offerors were to include the government-provided amounts on their price schedule and thus its price proposal would not have been an issue. Thus, Safeguard effectively asks that we find that the agency should excuse the protester's own failure to follow explicit proposal preparation instructions.

> We decline to do so here because the solicitation's evaluation criteria specifically allowed the agency to reject proposals on this basis. The evaluation criteria advised that offerors' prices would be evaluated to

---

[9] Alex Ginsburg was counsel of record for Safeguard in Case No. 18-1515C, and Alex Tomaszczuk was designated as of counsel in Case No. 18-1515C. In the above-captioned, current protest, Alex Tomaszczuk is counsel of record for Safeguard, and Alex Ginsburg is designated as of counsel. In earlier-filed Case No. 18-1515C, B&O also had filed a motion to intervene, which the court granted. Todd Overman originally was counsel of record for intervenor B&O in Case No. 18-1515C. Subsequently in Case No. 18-1515C, Richard Arnholt was substituted as counsel of record for intervenor B&O, and Todd Overman was designated as of counsel. In the above-captioned, current protest, Richard Arnholt is counsel of record for intervenor, and Todd Overman is designated as of counsel.

determine whether the offered prices were "fair and reasonable, *complete,* balanced and/or realistic." (emphasis added). The fact that the evaluation criteria advised that prices would be evaluated for completeness is critical because that section defined a complete price as one that was "in compliance with the Price Volume instructions in the solicitation." In this way, the evaluation criteria provided that proposals would be evaluated based on their compliance with the proposal preparation instructions.

Further, the preparation instructions advise that proposals must include a "completed Schedule B." This instruction is significant because it means that the evaluation would factor in whether offerors had submitted complete price schedules and could reject proposals as noncompliant on this basis. As a final step in this analysis, we highlight that the agency amended the solicitation to require offerors to include the government-provided amounts for the reimbursable CLINs on their price schedules. Thus, the terms of the solicitation show that the evaluation criteria contemplated a compliance check whereby the agency could reject a proposal as noncompliant when the price schedule did not include the government-provided amounts for the reimbursable CLINs. In view of the fact that Safeguard did not include the government-provided amounts on its price schedule, we find that the agency reasonably evaluated its proposal as noncompliant. Accordingly, we deny this protest allegation.

Id. at 2-3 (internal references, citations, and footnote omitted).

On Friday, January 11, 2019, after the business hours of the Clerk's Office had ended, Safeguard filed a complaint in the above-captioned protest in this court. On Monday, January 14, 2019, the court was closed due to inclement weather. On Tuesday, January 15, 2019, the Clerk's Office assigned the above-captioned protest to the undersigned. That same day, defendant filed a motion to stay the above-captioned protest due to a lapse of appropriations for the United States Department of Justice, which defendant noted had started "[a]t the end of the day on December 21, 2018." Also on January 15, 2019, B&O filed a motion to intervene in this protest, which the court granted. Additionally, on January 15, 2019, the court issued an Order directing protestor and B&O to file responses to defendant's motion to stay the above-captioned protest. In the responses to defendant's motion to stay, neither protestor nor B&O opposed defendant's January 15, 2019 motion to stay. Therefore, the court granted defendant's motion to stay the above-captioned protest. On January 31, 2019, after appropriations had been restored to the Department of Justice, the court issued an Order lifting the stay in the above-captioned protest.

On February 1, 2019, protestor filed a four-count amended complaint in this court. In Count I of the amended complaint, protestor argues that the Agency arbitrarily and capriciously disqualified Safeguard's proposal for failing to include the government provided "plug numbers" in Amendment No. 3 to the Solicitation. In Count II, protestor asserts that the Agency's disqualification of Safeguard was arbitrary and capricious

because the Agency did not consider whether the omission of the plug numbers was an "'informality' or 'minor irregularity'" subject to waiver under FAR clause 52.212-1. In Count III of the amended complaint, protestor contends that the Agency breached the covenant of good faith and fair dealing by failing to consider Safeguard's proposal in a fair and honest manner. Count III also asserts that the Agency's disqualification of Safeguard was "pretextual" because of "the checkered history and ongoing litigation between Safeguard and the Agency." In Count IV of the amended complaint, protestor requests a permanent injunction, and, in protestor's request for relief, protestor requests that the court permanently enjoin performance under the B&O Contract and require that the Agency reevaluate Safeguard's proposal. Protestor also requests a declaration that the Agency's decision to disqualify Safeguard's proposal was arbitrary and capricious, as well as "[s]uch further relief as this Court deems just and proper, including attorney fees under the Equal Access to Justice Act."

On February 26, 2019, defendant filed the administrative record in the above-captioned protest, which contained twenty-four tabs of documents. During the evening on March 4, 2019, in accordance with the court's instructions during an earlier conference with the parties, counsel of record for protestor sent an email message to the court's email address, on which counsels of record for defendant and defendant-intervenor were copied, asserting that the administrative record submitted by defendant was not complete because the administrative record did not contain any documents relating to Count III of the protestor's amended complaint. In the March 4, 2019 email message, counsel of record for protestor requested to take the depositions of "the Contracting Officer, the Source Selection Authority, and the Legal Advisor." On March 5, 2019, the court held a hearing with the parties to discuss counsel of record for protestor's March 4, 2019 email message, and, on March 6, 2019, the court issued an Order denying protestor's request to depose Agency personnel, stating, "at this time, protestor has not sufficiently supported its request for discovery related to Count III of protestor's amended complaint." (citing AgustaWestland N. Am., Inc. v. United States, 880 F.3d 1326, 1332 (Fed. Cir. 2018); Torres Advanced Enter. Sols., LLC v. United States, 133 Fed. Cl. 496, 521 (2017); and Jacobs Tech. Inc. v. United States, 131 Fed. Cl. 430, 454-55 (2017)). In the March 6, 2019 Order, the court also directed counsel of record for defendant to consult with the Agency in order to discuss the alleged omitted documents which protestor alleged should have been included in the administrative record previously filed by defendant on February 26, 2019.

On March 15, 2019, defendant filed a corrected administrative record in the above-captioned protest, which contained thirteen additional tabs of documents.[10] Protestor also moved to supplement the administrative record with a January 31, 2019 affidavit signed by Diana Parks Curran, an attorney who had appeared for Safeguard in its protests at the GAO and who was designated as of counsel in Case No. 18-1515C in this court,[11] as well

---

[10] Any reference below to the administrative record in this Opinion refers to the corrected administrative record filed by defendant on March 15, 2019.

[11] Diana Parks Curran has not been designated as of counsel in the above-captioned, current protest.

as a March 11, 2019 affidavit signed by Sadananda Suresh Prabhu, the president of SRM Group. In the affidavit signed by Diana Parks Curran, Ms. Curran discusses verbal conversations between Ms. Curran and James Caine, legal advisor for the Agency, in which Mr. Caine allegedly made statements such as "'it is not a secret that there is bad blood between FLETC and [SRM's President] Suresh [Prabhu].'" (alterations in original). Diana Parks Curran attached to her affidavit a timeline of events created by Ms. Curran, which recounted her version of the events related to SRM Group's protests at the GAO, as well as events related to appeals filed by SRM Group at the United States Civilian Board of Contract Appeals. In the March 11, 2019 affidavit signed by Sadananda Suresh Prabhu, Mr. Prabhu alleges that James Caine called him "'greedy'" and "'unscrupulous.'" According to Mr. Prabhu's affidavit, after Safeguard had filed an amended request for an equitable adjustment with the Agency:

> [O]n or about September 25, 2017, Ms. Wood called me wanting to know why SRM had chosen to file another REA [request for equitable adjustment]. She stated that I had "humiliated" her by filing the Amended REA and vowed never to work with me or SRM in the future. I asked her if that meant that DHS would not renew SRM's Contract, and her response was, "Nobody who has ever sued the Government has been a [sic] awarded a Contract."

> During that same telephone conversation in September 2017, Ms. Wood told me that she would no longer talk to me or meet with me. Since then, Ms. Wood has refused to meet with either me or SRM's Program Manager for the Contract, Mr. Larry McLendon.

Defendant and defendant-intervenor filed oppositions in response to protestor's March 15, 2019 motion to supplement the administrative record, and, on March 21, 2019, the court held a hearing with the parties regarding the parties' filings related to protestor's March 15, 2019 motion. On March 22, 2019, the court issued an Order denying protestor's March 15, 2019 motion and stating that "[s]upplementation of the administrative record with the proffered documents is not warranted at this time because, for the reasons discussed with the parties during the hearing, as well as the documents already included in the administrative record, the proffered documents are not necessary for effective judicial review." (citing AgustaWestland N. Am., Inc. v. United States, 880 F.3d at 1331-32; and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009)).

On April 2, 2019, protestor and defendant filed simultaneous motions for judgment on the administrative record. Also on April 2, 2019, defendant-intervenor filed a motion to dismiss, or, in the alternative, cross-motion for judgment on the administrative record. In its April 2, 2019 motion to dismiss, defendant-intervenor argued that the court should dismiss Safeguard's protest because Safeguard lacks standing, as Safeguard allegedly is not an 8(a) eligible joint venture and, consequently, could not have been awarded a contract under the Solicitation, which was set-aside for 8(a) offerors.[12] On April 16, 2019,

---

[12] Defendant has not argued that Safeguard lacks standing in the above-captioned protest. At the May 1, 2019 oral argument, in response to a question by the court

protestor, defendant, and defendant-intervenor filed simultaneous replies. On May 1, 2019, the court heard oral argument in the above-captioned protest.

## DISCUSSION

The parties have cross-moved for judgment on the administrative record. Rule 52.1(c)(1) (2019) of the Rules of the United States Court of Federal Claims (RCFC) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005))); see also Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353-54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2018)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332; Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell

---

regarding defendant-intervenor's motion to dismiss and whether there was a standing issue, counsel of record for defendant stated, "I don't perceive one, Your Honor."

Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319.

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350-51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)))), reh'g and reh'g en banc denied (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[13] see also Tinton Falls

---

[13] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;

Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351),

---

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013);  McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531-32 ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)), subsequent determination, 96 Fed. Cl. 119 (2010).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir.

2003) (citing <u>Ray v. Lehman</u>, 55 F.3d 606, 608 (Fed. Cir.), <u>cert. denied</u>, 516 U.S. 916 (1995)); <u>Synergy Sols., Inc. v. United States</u>, 133 Fed. Cl. at 735 (citing <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332-33). """If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.""" <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1371 (quoting <u>Honeywell, Inc. v. United States</u>, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting <u>M. Steinthal & Co. v. Seamans</u>, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); <u>Limco Airepair, Inc. v. United States</u>, 130 Fed. Cl. 544, 550 (2017) (citation omitted); <u>Jordan Pond Co., LLC v. United States</u>, 115 Fed. Cl. 623, 631 (2014); <u>Davis Boat Works, Inc. v. United States</u>, 111 Fed. Cl. 342, 349 (2013); <u>Norsat Int'l [America], Inc. v. United States</u>, 111 Fed. Cl. 483, 493 (2013); <u>HP Enter. Servs., LLC v. United States</u>, 104 Fed. Cl. 230, 238 (2012); <u>Vanguard Recovery Assistance v. United States</u>, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

<u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971) (internal citations omitted), <u>abrogated on other grounds by Califano v. Sanders</u>, 430 U.S. 99 (1977); <u>see also U.S. Postal Serv. v. Gregory</u>, 534 U.S. 1, 6-7 (2001); <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 285 (1974), <u>reh'g denied</u>, 420 U.S. 956 (1975); <u>Co-Steel Raritan, Inc. v. Int'l Trade Comm'n</u>, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); <u>In re Sang Su Lee</u>, 277 F.3d at 1342; <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. at 285)); <u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d 955, 959 (Fed. Cir. 1993); <u>By Light Prof'l IT Servs., Inc. v. United States</u>, 131 Fed. Cl. 358, 366 (2017); <u>BCPeabody Constr. Servs., Inc. v. United States</u>, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting <u>Keeton Corrs., Inc. v. United States</u>, 59 Fed. Cl. 753, 755, <u>recons. denied</u>, 60 Fed. Cl. 251 (2004); and <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d at 1381)), <u>appeal dismissed</u>, 559 F. App'x

1033 (Fed. Cir. 2014); <u>Supreme Foodservice GmbH v. United States</u>, 109 Fed. Cl. at 382; <u>Alamo Travel Grp., LP v. United States</u>, 108 Fed. Cl. 224, 231 (2012); <u>ManTech Telecomms. & Info. Sys. Corp. v. United States</u>, 49 Fed. Cl. 57, 63 (2001), <u>aff'd</u>, 30 F. App'x 995 (Fed. Cir. 2002).

> According to the United States Court of Appeals for the Federal Circuit:
>
> Effective contracting demands broad discretion. <u>Burroughs Corp. v. United States</u>, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); <u>Sperry Flight Sys. Div. v. United States</u>, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); <u>see</u> <u>NKF Eng'g, Inc. v. United States</u>, 805 F.2d 372, 377 (Fed. Cir. 1986); <u>Tidewater Management Servs., Inc. v. United States</u>, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); <u>RADVA Corp. v. United States</u>, 17 Cl. Ct. 812, 819 (1989), <u>aff'd</u>, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." <u>Tidewater Management Servs.</u>, 573 F.2d at 73, 216 Ct. Cl. 69.

<u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d at 958-59; <u>see also</u> <u>Res-Care, Inc. v. United States</u>, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting <u>Tyler Constr. Grp. v. United States</u>, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), <u>reh'g en banc denied</u> (Fed. Cir. 2014); <u>Grumman Data Sys. Corp. v. Dalton</u>, 88 F.3d 990, 995 (Fed. Cir. 1996); <u>Geo-Med, LLC v. United States</u>, 126 Fed. Cl. 440, 449 (2016); <u>Cybertech Grp., Inc. v. United States</u>, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the United States Court of Appeals for the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." <u>CHE Consulting, Inc. v. United States</u>, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

<u>PAI Corp. v. United States</u>, 614 F.3d at 1351; <u>see also</u> <u>AgustaWestland N. Am., Inc. v. United States</u>, 880 F.3d at 1332 ("Where, as here, a bid protester challenges the procurement official's decision as lacking a rational basis, we must determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332-33 (internal quotation marks and citation omitted))); <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke [ ] "highly deferential"

rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Fall Lodging Realty, LLC v. United Sates, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995-96; Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 578 (2017); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; T Square Logistics Servs. Corp. v. United States, 134 Fed. Cl. 550, 555 (2017); FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014), appeal dismissed (Fed. Cir. 2015); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. at 496. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); IT Enter. Sols. JV, LLC v. United States, 132 Fed. Cl. 158, 173 (2017) (citing Bannum v. United States, 404 F.3d at 1357-58); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d

1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'" (citation omitted)).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances. This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . . To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; and Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United

<u>States</u>, 213 F.3d at 1380 (using a "substantial chance" test); <u>Am. Corr. Healthcare, Inc.</u>
<u>v. United States</u>, 137 Fed. Cl. 395, 410 (2018) (using a "substantial chance" test); <u>Vintage</u>
<u>Autoworks, Inc. v. United States</u>, 132 Fed. Cl. 143, 149 (2017) (using a "substantial
chance" test); <u>Active Network, LLC v. United States</u>, 130 Fed. Cl. 421, 427 (2017) (using
a "substantial chance" test); <u>Archura LLC v. United States</u>, 112 Fed. Cl. at 496 (using a
"substantial chance" test); <u>Info. Scis. Corp. v. United States</u>, 73 Fed. Cl. 70, 96 (2006)
(using a "substantial chance" test), <u>recons. in part</u>, 75 Fed. Cl. 406 (2007).

## Whether Offerors Were Required to Price CLINs X007AA and X007AB

In the above-captioned protest, protestor argues that the Solicitation did not require
offerors to price CLINs X007AA and X007AB, while defendant and defendant-intervenor
argue that the terms of the Solicitation, and amendments thereto, required offerors to
price CLINs X007AA and X007AB. Protestor notes that the descriptions in Schedule of
Supplies/Services for CLINs X007AA and X007AB stated "*****DO NOT SUBMIT
PRICING FOR THESE CLINS*****" and asserts that "[t]his explicit direction" was never
altered in any of the five amendments to the Solicitation. (capitalization in original).
Protestor argues that the statement in the Agency's answer to question 9 in Amendment
No. 3 to the Solicitation, which stated to "please include" the list of "'not-to-exceed'
amounts" for CLINs X007AA and X007AB, was a "suggestion" that was "precatory rather
than mandatory" and "cannot be a basis for disqualifying proposals as noncompliant."
Protestor argues that its proposal, which did not include amounts for CLINs X007AA and
X007AB, complied with the statement in the Schedule of Supplies/Services to "NOT
SUBMIT PRICING FOR" CLINs X007AA and X007AB. (capitalization in original).
Protestor also argues that, "even if there were an argument that a superficial contradiction
existed between the original Solicitation and Q&A [question and answer] No. 9 in
Amendment 3, this argument would be foreclosed by the Solicitation's Order of
Precedence Clause." According to protestor:

> This clause [the Order of Precedence clause] resolves any potential internal
> conflict by stating that "[a]ny inconsistencies in this solicitation shall be
> resolved by giving precedence in the following order: (1) *the schedule of*
> *supplies/services* . . . (4) *addenda to this solicitation or contract* . . . .
> Given this clause, even assuming, *arguendo*, that Q&A No. 9 required
> offerors to fill in the plug numbers for the Service Work Request CLINs, the
> language directing offerors *not* to submit pricing for these same CLINs –
> which appears in the Schedule of Supplies/Services – would take
> precedence and control.

(emphasis in original) (footnote omitted).

Both defendant and defendant-intervenor, however, assert that offerors were
required to include in their price proposals the pricing information for CLINs X007AA and
X007AB. In defendant's cross-motion for judgment on the administrative record,
defendant argues that, "[a]lthough the solicitation originally omitted the Government-

provided pricing for the 16 maintenance request CLINs, Amendment 0003 to the solicitation unequivocally remedied that omission and instructed offerors to 'include' Government-provided prices for these CLINS 'for bidding purposes,' which totaled $6,121,228."[14] Defendant asserts:

> As the Second Circuit stated in <u>Weaver v. Axis Surplus Ins. Co.</u>, 639 Fed. Appx. 764, 767 (2d Cir. 2016), "[a] demand may be couched in the customarily-used polite language of the day." . . . Similarly, here, the word "please," by itself, is not sufficient to render Amendment 0003's pricing instructions precatory.

(alteration in original). Regarding protestor's argument concerning the Solicitation's Order of Precedence clause, defendant asserts that Amendment No. 3 to the Solicitation should not be classified as "addenda" to the Solicitation, and that "the original instruction to not submit prices was intended to direct offerors to not submit their *own* prices for the maintenance request CLINs." (emphasis in original).

In defendant-intervenor's cross-motion for judgment on the administrative record, defendant-intervenor argues:

> The Solicitation required offerors to submit a completed Schedule B and to include pricing for the phase-in period, base period, and seven option periods, which included CLINs X007AA and X007AB. Here, the omitted CLIN pricing represented a sum of $6,121,288 over 16 CLINs. While Amendment 0003 clarified the amounts to insert into Schedule B for offerors' price proposals, the requirement to submit a completed Schedule B was present from the time of the original Solicitation.

(internal references omitted). Defendant-intervenor also contends that, "[w]hile Court of Federal Claims precedent does not appear to directly address the specific 'please include' language, GAO has found that even permissive language is not always permissive when interpreted consistently with the solicitation as a whole." (citation omitted). According to defendant-intervenor, "the Solicitation read as a whole required a completed Schedule B, and it was not possible to submit a completed Schedule B without the numbers that offerors were instructed to 'please include' in Amendment 0003." Additionally, defendant-intervenor argues, as does defendant, that protestor's assertion addressing the Solicitation's Order of Precedence clause fails because Amendment No. 3 is not "addenda" to the Solicitation and "the proper interpretation [of Amendment No. 3] requires reading the Solicitation as a whole and as amended."

The interpretation of a solicitation is a question of law. <u>See</u> <u>Synergy Sols., Inc. v. United States</u>, 133 Fed. Cl. at 736 (quoting <u>Banknote Corp. of Am., Inc. v. United States</u>,

---

[14] As noted above and discussed below, answer 9 in Amendment No. 3 to the Solicitation stated: "**For bidding purposes please include the following 'not-to-exceed' amounts in the applicable CLIN**" and provided a chart with amounts for CLINs X007AA and X007AB. (emphasis in original).

365 F.3d at 1353); see also Greenland Contractors I/S v. United States, 131 Fed. Cl. 216, 227 (2017) (citing CBY Design Builders v. United States, 105 Fed. Cl. 303, 327 (2012)). Regarding the interpretation of a solicitation, the United States Court of Appeals for the Federal Circuit has stated:

> ["]We begin with the plain language of the document. The solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation. If the provisions of the solicitation are clear and *unambiguous*, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them. Finally, we must consider the *solicitation as a whole*, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.["]

See Per Aarsleff A/S v. United States, 829 F.3d at 1309 (emphasis in original) (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353); see also ARxIUM, Inc. v. United States, 136 Fed. Cl. 188, 198 (2018) ("When interpreting a solicitation, the document must be considered as a whole and interpreted in a manner that harmonizes and gives reasonable meaning to all of its provisions." (internal quotation marks and citations omitted)).

Interpretation of an amendment to a solicitation "begins with an examination of its [the amendment's] plain language." Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 563 (2012) (citations omitted). The court is to interpret the amendment and solicitation "'as a whole and in a manner which gives reasonable meaning to all parts and avoids conflict or surplusage of its provisions.'" See HomeSource Real Estate Asset Servs., Inc. v. United States, 94 Fed. Cl. 466, 483 (2010) (quoting the undersigned's decision in Metro. Van & Storage, Inc. v. United States, 92 Fed. Cl. 232, 264 (2010)), aff'd, 418 F. App'x 922 (Fed. Cir. 2011); see also BayFirst Sols., LLC v. United States, 102 Fed. Cl. 677, 689 (2012) (considering the meaning of an amendment to a solicitation in the context of the solicitation's requirements).

In the above-captioned protest, the Solicitation's Schedule of Supplies/Services stated, in the all of the descriptions of CLINs X007AA, "*****DO NOT SUBMIT PRICING FOR THESE CLINS*****." (capitalization in original). All of the descriptions in the Schedule of Supplies/Services of CLINs X007AB also stated "*****DO NOT SUBMIT PRICING FOR THESE CLINS*****." (capitalization in original). Notwithstanding that the all of the descriptions for CLINs X007AA and X007AB stated "*****DO NOT SUBMIT PRICING FOR THESE CLINS*****," the Schedule of Supplies/Services provided a "QUANTITY" amount of "1," as well as a "UNIT" amount of "LO"[15] for CLINs X007AA and X007AB in each period of performance. (capitalization in original). The Schedule of Supplies/Services also provided blank lines under a column labeled "UNIT PRICE" and under a column labeled "AMOUNT" for CLINs X007AA and X007AB. (capitalization in original).

---

[15] "LO" is not defined in the Solicitation. (capitalization in original). As discussed below, however, "LO" appears to stand for "LOT." (capitalization in original).

In the Solicitation at issue, below the statement "*****DO NOT SUBMIT PRICING FOR THESE CLINS*****" in the descriptions of CLINs X007AA, the descriptions of CLINs X007AA in the Schedule of Supplies/Services Solicitation stated that "[t]hese CLINS [CLINs X007AA] shall be performed on a fixed price basis and used with service work requests, internal orders, and over-and-above orders placed against this contract." (capitalization in original). Amendment No. 3 modified the above-quoted sentence to state: "These CLINS [CLINs X007AA] shall be performed on a fixed price basis and used with service work requests placed against this contract." The description of CLINs X007AA further stated: "The amount listed is the Government 'Ceiling' and is a 'not-to-exceed' amount with no guarantee that this amount will be used. The amount provided is shown as a lump sum; however, this does not mean that the contractor will be paid a lump sum." Regarding CLINs X007AB, the descriptions of CLINs X007AB stated that CLINs X007AB were "for reimbursement, at cost, for replacement equipment," such as televisions, microwaves, and refrigerators. The description of CLINs X007AB stated:

> The amount listed is a "Not-to-Exceed" amount with no guarantee that this amount will be used. The contractor shall not exceed this amount without prior approval of the Contracting Officer in writing. The Government will not be liable for any costs in excess of this amount unless such prior approval has been obtained.

(capitalization in original). In the paragraph before the CLINs were listed for the base period of performance, the Schedule of Supplies/Services stated that CLINs 0007AA and 0007AB "are pre-priced and performed as authorized by the Contracting Officer. The amounts listed for these CLINS are a 'not to exceed' amount with no guarantee that the total amount will be used." Identical language appeared in the Schedule of Supplies/Services before the CLINs were listed for each option period of performance.

The Solicitation's Schedule of Supplies/Services, therefore, indicated, multiple times, that there should have been a government ceiling or not-to-exceed "amount listed" or "amount provided" for each of CLINs X007AA and X007AB on the Solicitation's Schedule of Supplies/Services. All sixteen of the descriptions of CLINs X007AA and X007AB indicated that there was to be a ceiling or not-to-exceed "amount listed" or "amount provided" for CLINs X007AA and X007AB, which the paragraphs preceding each period of performance stated were "pre-priced" amounts. Offerors were instructed to "NOT SUBMIT PRICING FOR THESE CLINS [CLINs X007AA and X007AB]" because, as indicated in the Schedule of Supplies/Services, CLINs X007AA and X007AB were "pre-priced" by the government as ceiling or not-to-exceed amounts that could not be exceeded without prior authorization by the contracting officer. Because the amounts for CLINs X007AA and X007AB were "pre-priced" and the "amounts listed for these CLINS [CLINs X007AA and X007AB] are a 'not to exceed' amount with no guarantee that the total amount will be used," offerors did not need to submit their own pricing amounts for CLINs X007AA and X007AB, as the government already had predetermined the amounts for CLINs X007AA and X007AB which offerors were not to exceed during performance. It is undisputed, however, that the Schedule of Supplies/Services in the Solicitation did not list government ceiling amounts or not-to-exceed amounts for CLINs X007AA and

36

X007AB. It also is undisputed that ceiling amounts or not-to-exceed amounts for CLINs X007AA and X007AB did not appear elsewhere in the Solicitation as originally issued on October 11, 2017, although the "pre-priced" amounts for CLINs X007AA and X007AB subsequently were provided in Amendment No. 3 to the Solicitation.

In Amendment No. 3 to the Solicitation, the Agency responded to 272 questions posed by potential offerors, including the following question:

9. **Q: Section B Price Schedule:** Schedule B – CLIN X007AA & X007AB: These CLINs state "The amount listed is the Government "Ceiling" and is a "not-to-exceed" amount", however there are no amounts listed. What are the not-to-exceed amounts for these CLINs?
**A: For bidding purposes please include the following "not-to-exceed" amounts in the applicable CLIN:**

| CLIN | AMOUNT | CLIN | AMOUNT | CLIN | AMOUNT |
|------|--------|------|--------|------|--------|
| 0007AA | $124,688.00 | 3007AA | $549,872.00 | 6007AA | $636,546.00 |
| 0007AB | $ 59,063.00 | 3007AB | $260,466.00 | 6007AB | $301,522.00 |
| 1007AA | $498,750.00 | 4007AA | $577,366.00 | 7007AA | $636,546.00 |
| 1007AB | $236,250.00 | 4007AB | $273,489.00 | 7007AB | $301,522.00 |
| 2007AA | $523,688.00 | 5007AA | $606,234.00 | | |
| 2007AB | $248,063.00 | 5007AB | $287,163.00 | | |

(emphasis in original). The agency's answer to question 9 states that offerors should "please include" the provided government "'not-to-exceed' amounts" for CLINs X007AA and X007AB "[f]or bidding purposes." The Agency also provided offerors with the government ceiling amounts or not-to-exceed amounts that were referenced, but omitted, in the Solicitation's Schedule of Supplies/Services for CLINs X007AA and X007AB. In the Agency's answer to question 9, the word "please" is used as an adverb to modify the verb "include." The Oxford English Dictionary defines the word "please," when used as an adverb, as "[u]sed in polite request or agreement, or to add a polite emphasis or urgency: kindly, if you please." Please, OXFORD ENGLISH DICTIONARY (3d ed. 2019). The Oxford English Dictionary defines the word "include" as "[t]o have, put in, or incorporate as part of a whole." Include, OXFORD ENGLISH DICTIONARY (3d ed. 2019). Although the adverb "please" may indicate a "polite request" or "add a polite emphasis," the word "please" only is the modifying adverb of the verb "include," which indicates a direction to "put in." The Agency's answer to question 9 provides the amounts for CLINs X007AA and X007AB that bidders are to "put in" or "include" in their price proposals in response to the Solicitation "[f]or bidding purposes." "[T]he meaning of words depends on their context," see Madison Galleries, Ltd. v. United States, 870 F.2d 627, 631 (Fed. Cir. 1989), and the language used in the Agency's answer to question 9 can be read as an instruction to insert the listed amounts for CLINs X007AA and X007AB into the proposals submitted in response to the Solicitation, with the word "please" used as a "polite" modifier of the verb "include," as the more proper interpretation of the Solicitation as issued by the Agency, including Amendment No. 3 and the answers to the questions which were part of the total procurement process.

Moreover, the Agency's answer to question 16 in Amendment No. 3 provided:

> **16.   Q: Section B Price Schedule:** Will the Government provide a ceiling number for CLINS XXX7AB to be included for submission in Volume 3-Price?
> **A: See response to Question 9.**

The Agency's answer in response to question 16 indicated to offerors that the amounts listed in the Agency's answer in response to question 9 for CLINs X007AB were "to be included for submission in Volume 3-Price." Neither answer 9 nor answer 16 in Amendment No. 3 indicate that offerors had discretion as to whether to include the government ceiling or not-to-exceed amounts for CLINs X007AA and X007AB.

The court must interpret the Agency's statements in Amendment No. 3 in the context of the Solicitation. As discussed above, the Schedule of Supplies/Services indicated that the Solicitation was supposed to have "listed" or "provided" "pre-priced" government ceiling or not-to-exceed amounts for CLINs X007AA and X007AB. The Agency did not provide those amounts in the Solicitation as originally issued on October 11, 2017, but the Agency provided the "pre-priced" government ceiling or not-to-exceed amounts for CLINs X007AA and X007AB in the Agency's answer to question 9 in Amendment No. 3. In Amendment No. 3, the Agency instructed offerors to "include" the amounts listed in answer 9 for CLINs X007AA and X007AB in their price proposals "[f]or bidding purposes." The Solicitation's statement to "NOT SUBMIT PRICING FOR THESE CLINS [CLINs X007AA and X007AB]," when read in the context of the entire Solicitation and together with Amendment No. 3, indicated to offerors that offerors should not submit their own independent pricing for CLINs X007AA and X007AB. Rather, the offerors, when preparing their price proposals in response to the Solicitation, were to use the government "pre-priced" ceiling or not-to-exceed amounts provided in Amendment No. 3 for CLINs X007AA and X007AB and should not have failed to submit pricing information for CLINs X007AA and X007AB. The court's interpretation of the Solicitation and Amendment No. 3 provides meaning to all parts of the text of Solicitation, including the text of Amendment No. 3, and produces no conflict or inconsistency between the terms in the Solicitation and Amendment No. 3.

That the Schedule of Supplies/Services listed a "QUANTITY" amount of "1" and a "UNIT" amount of "LO" for each of CLINs X007AA and X007AB also should have indicated to offerors to include a "UNIT" price and "AMOUNT." (capitalization in original). Each period of performance on the Schedule of Supplies/Services is designated as a "LOT."[16] (capitalization in original). For example, the base period of performance is "LOT I," the first option period of performance is designated as "LOT II," the second option period of performance is designated as "LOT III," etc. (capitalization in original). The "QUANTITY" amount of "1" and a "UNIT" amount of "LO" on the Schedule of Supplies/Services indicates that offerors were to submit a single "UNIT PRICE" for the relevant "LOT" under CLINs X007AA and X007AB. (capitalization in original). The "UNIT PRICE" information

---

[16] Although the Solicitation indicated a "UNIT" amount of "LO," each period of performance was designated in the Solicitation as a "LOT." (capitalization in original).

for each "LOT" was provided in answer 9 in Amendment No. 3 for CLINs X007AA and X007AB. (capitalization in original). In B&O's price proposal, B&O included the respective CLIN amounts provided in answer 9 in Amendment No. 3 as the "UNIT PRICE" amounts, as well as the total "AMOUNT" for each lot, for CLINs X007AA and X007AB. If offerors were not to submit any "UNIT PRICE" or "AMOUNT" for CLINs X007AA and X007AB, listing a "QUANTITY" amount of "1" and a "UNIT" amount of "LO" in the Solicitation for each of CLINs X007AA and X007AB would have been unnecessary because the offerors would not have needed to include the government provided amounts for CLINs X007AA and X007AB in the "UNIT PRICE" and "AMOUNT" columns. (capitalization in original).

Moreover, protestor's reliance on the Solicitation's Order of Precedence clause is misplaced. The Solicitation's Order of Precedence clause states:

> (s) *Order of precedence.* Any inconsistencies in this solicitation or contract shall be resolved by giving precedence in the following order: (1) the schedule of supplies/services; (2) The Assignments, Disputes, Payments, Invoice, Other Compliances, Compliance with Laws Unique to Government Contracts, and Unauthorized Obligations paragraphs of this clause; (3) the [Federal Acquisition Regulation (FAR)] clause at 52.212-5; (4) addenda to this solicitation or contract, including any license agreements for computer software; (5) solicitation provisions if this is a solicitation; (6) other paragraphs of this clause; (7) the Standard Form 1449; (8) other documents, exhibits, and attachments; and (9) the specification.

(capitalization and emphasis in original). Because the terms of the Solicitation and Amendment No. 3 do not conflict, as discussed above, however, the court need not reach the Solicitation's Order of Precedence clause to resolve alleged "inconsistencies in this solicitation" when determining whether offerors were required to include the government provided ceiling or not-to-exceed amounts for CLINs X007AA and X007AB.

Thus, the court finds that offerors were required to include in their price proposals the government provided ceiling or not-to-exceed amounts for CLINs X007AA and X007AB, and that it was not arbitrary and capricious for the Agency to require inclusion of the amounts for CLINs X007AA and X007AB.

## Whether the Agency Arbitrarily and Capriciously Disqualified Safeguard

Protestor argues that, even if the Solicitation and Amendment No. 3 required offerors to include the "plug numbers" for CLINs X007AA and X007AB, it was unreasonable for the Agency to disqualify protestor because the Agency did not "reasonably announce" that offerors could be disqualified for failure to include the government provided "plug numbers." Protestor argues:

> DHS represented that it disqualified Safeguard based on the following Solicitation language: "Exceptions to the *line item structure in Section B* may result in a bid not considered for award." (emphasis added). This

provision is unqualified and ***pertains only to the structure of the line items provided in <u>Section B</u>***, which solely outlines a period of performance schedule and gives a brief description of the phase-in period. Section B does not refer to pricing any CLINs whatsoever other than CLIN 0001A for the phase-in period only. The alleged non-compliance in Safeguard's proposal relates to ***<u>Schedule</u> B *not* Section B.*** Thus, even assuming *arguendo* that DHS identified a non-compliance in Safeguard's proposal, DHS *still* has cited no reasonable basis to disqualify the proposal.

(emphasis in original) (internal references omitted).

Protestor also argues that the Agency arbitrarily and capriciously disqualified Safeguard's proposal for failing to include the government provided ceiling or not-to-exceed amounts for CLINs X007AA and X007AB. Protestor argues that the Agency failed to consider whether "Safeguard's omission of the Agency plug numbers constituted an 'informality' or 'minor irregularity' subject to waiver, under FAR 52.212-1, which was incorporated into the Solicitation." According to protestor, the United States Court of Federal Claims "has held that waiving such minor 'form over substance' types of irregularities are proper exercises of an agency's discretion." (citations omitted). Protestor further argues that the Agency could have resolved Safeguard's omission of the "plug numbers" for CLINs X007AA and X007AB through "clarifications." Protestor also contends that "the Agency had twice before been able to evaluate Safeguard's proposal despite the absence of the plug numbers."

In defendant's cross-motion for judgment on the administrative record, defendant argues that the Solicitation "warns that 'Pricing Schedule and Periods of Performance (POP) Service dates for each CLIN are detailed in Section B' and that '[e]xceptions to line item structure in Section B may result in a bid not considered for award.'" According to defendant, "Section B includes the Pricing Schedule, as exemplified by Amendment 0003's reference to 'Section B Price Schedule,'" and the "'line item structure in Section B' refers to CLINs, including the maintenance service request CLINs at issue. Thus, Safeguard was on notice that its failure to follow Amendment 0003's line item structure – and include the maintenance request pricing in its proposal – could result in the rejection of its proposal." Defendant cites to FAR § 15.204-2 (2019), titled "Part I -- The Schedule," and argues that "Schedule B is simply another way to referring to Section B and vice versa."

According to defendant's motion for judgment on the administrative record, under FAR clause 52.212-1(g), the Agency may not waive "material errors," and "[t]his Court has repeatedly recognized that pricing omissions – like the ones that occurred here – are material errors." Defendant argues that Safeguard's "pricing omissions" violate the terms of the Solicitation because offerors were required to include the amounts provided by the government for CLINs X007AA and X007AB. Defendant asserts that Safeguard's "pricing omissions" prohibited the Agency from making an "apples-to-apples" comparison of Safeguard's total price with other offeror's total price, which included the government provided amounts for CLINs X007AA and X007AB.

Defendant-intervenor also cites to FAR § 15.204-2 and argues that Safeguard's "tortured" argument involving Section B fails because "Section B contains the supplies or services *and their prices*, and this section is to '[i]nclude a brief description of the supplies or services; e.g., item number, national stock number/part number if applicable, nouns, nomenclature, and quantities.' Those brief descriptions are included on Schedule B." (emphasis in original) (quoting FAR § 15.204-2). Regarding the disputed Section B language in the Solicitation, defendant-intervenor argues:

> As Safeguard stated, its limited view of Section B only contained the periods of performance for the base period and option years as well as a requirement to price the phase-in period. That, of course, makes no sense. The cautionary language clearly states that both the "Pricing Schedule" <u>and</u> the "Periods of Performance for each CLIN" were in Section B, and Safeguard itself managed to find Schedule B and quote prices for at least some of the those CLINs.

(emphasis in original) (internal references omitted).

In defendant-intervenor's motion for judgment on the administrative record, defendant-intervenor argues that it was not arbitrary or capricious for the Agency to disqualify Safeguard's proposal for failing to include the amounts for CLINs X007AA and X007AB. Defendant-intervenor contends that Safeguard's omission of the amounts for CLINs X007AA and X007AB was a material error not subject to waiver because the amounts were required by the Solicitation and were necessary for the Agency to evaluate Safeguard's proposed total price. Defendant-intervenor asserts that Safeguard's pricing omission could not have been remedied through clarifications because it is improper to resolve material errors through clarifications. Defendant-intervenor also argues that the Solicitation informed offerors that the Agency was intending to award a contract under the Solicitation without discussions.

The Solicitation in the above-captioned protest incorporated FAR clause 52.212-1(g), which states that "[t]he Government may reject any or all offers if such action is in the public interest; accept other than the lowest offer; and waive informalities and minor irregularities in offers received." <u>See</u> FAR § 52.212-1(g). Errors or omissions that are considered to be "material" are not subject to waiver under FAR clause 52.212-1(g). <u>See</u> <u>ManTech Advanced Sys. Int'l, Inc. v. United States</u>, 141 Fed. Cl. 493, 506 (2019) ("Because DOJ [the Department of Justice] only had the discretion to waive 'informalities and minor irregularities' [under FAR clause 52.212-1(g)], DOJ cannot waive errors that were rationally categorized as material."); <u>see</u> <u>also</u> <u>Bus. Integra, Inc. v. United States</u>, 116 Fed. Cl. 328, 337 (2014) ("Because Business Integra's error was material, the government was under no obligation to waive the error or allow Business Integra to correct the error."). Errors or omissions are considered to be material when the error or omission violates an express provision in the Solicitation that serves "a substantive purpose." <u>See</u> <u>ManTech Advanced Sys. Int'l, Inc. v. United States</u>, 141 Fed. Cl. at 506 (citations omitted); <u>see</u> <u>also</u> <u>MSC Indus. Direct Co. v. United States</u>, 140 Fed. Cl. 632,

643 (2018) ("Under FAR § 52.212-1(g) material elements are those necessary for a proposal to represent an offer to provide the exact thing called for in the request for proposals." (internal quotation marks and citation omitted)). A provision in the Solicitation "is considered to have a substantive purpose when it is important to the government's evaluation, is binding on the offeror, or has more than a negligible impact on the price, quantity, or quality of the bid." ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 508 (citations omitted). Under FAR clause 52.212-1(g), "omissions in proposals are material omissions when the excluded information is 'important to the government's evaluation of the offer.'" MSC Indus. Direct Co. v. United States, 140 Fed. Cl. at 643 (quoting Bus. Integra, Inc. v. United States, 116 Fed. Cl. at 334). Moreover, even if an error or omission is subject to waiver under FAR clause 52.212-1(g), an agency is not required to waive the error or omission. See T Square Logistics Servs. Corp. v. United States, 134 Fed. Cl. at 558 ("The fact that an agency is permitted to waive the submission format requirement, of course, does not mean it is required to do so." (emphasis in original)).

"Clarifications are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." FAR § 15.306(a)(1) (2019). Clarifications provide offerors with an "opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." FAR § 15.306(a)(2) (2019). Clarifications may not "'be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal.'" Dell Fed. Sys., L.P. v. United States, 906 F.3d at 998 (quoting JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 661 (2002), aff'd, 56 F. App'x 474 (Fed. Cir. 2003)); see also MSC Indus. Direct Co. v. United States, 140 Fed. Cl. at 646 ("'Clarifications' are reserved for only minor administrative errors and not material omissions.").

"Flowing from the permissive wording of" FAR § 15.306, a contracting officer's "decision to seek (or not to seek) clarification from an offeror is within his discretion." Criterion Sys., Inc. v. United States, 140 Fed. Cl. 29, 37 (2018); see also Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. at 629 (stating that a contracting officer has discretion when determining whether to seek clarifications); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. at 511 (stating that a contracting officer has discretion when deciding whether to seek clarifications, but determining that the contracting officer abused her discretion by not seeking clarifications). A Judge of the United States Court of Federal Claims has stated:

> While this court has found an abuse of discretion in bid protests governed by FAR Part 15 where the government failed to inquire into copying errors that affected the procuring authority's evaluation of past performance, see BCPeabody, 112 Fed. Cl. at 513, an omission of pricing information has not been found to be a minor or clerical error in these types of procurements, see ST Net[, Inc. v. United States], 112 Fed. Cl. [99,] at 111 [(2013)].

Bus. Integra, Inc. v. United States, 116 Fed. Cl. at 335; see also ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 512 ("This court has determined in several previous cases that proposals with missing mandatory price information contain material errors, even when the price information has a minimal impact the total price, so long as the needed prices will be considered in the evaluation process and binding on the offeror.").

The parties dispute concerning Schedule B and Section B requires the court to interpret those two terms in the context of the Solicitation and the amendments thereto, as neither term is explicitly defined in the Solicitation or the amendments. The issue before the court is whether the "Schedule B" referenced in the Solicitation is considered to be a part of "Section B." The first two pages of the Solicitation are provided on a government SF 1449, which is a government standard form "prescribed for use in solicitations and contracts for commercial items." See FAR § 53.212 (2019). Pages three through thirty of the Solicitation are provided on government OF 336, which is a government optional form. The regulation at FAR § 53.110 (2019) states that "all standard forms prescribed by the FAR," such as the government SF 1449, "may be continued on (a) plain paper of similar specification, or (b) specially constructed continuation sheets (e.g., OF 336)." See FAR § 53.110. In the Solicitation at issue in this protest, the government OF 336 continued the government SF 1449. The Schedule of Supplies/Services in the Solicitation begins in Block 20 on the SF 1449 and continues in column "(B)" on the government OF 336. Together, the initial thirty pages of the Solicitation consisted of the Schedule of Supplies/Services, including the CLINs, descriptions of CLINs, quantity amounts, unit amounts, unit prices, and total amounts for the base period of performance, as well as all seven option periods of performance. That the Schedule of Supplies/Services continues throughout column (B) on the government OF 336 appears to be the genesis of the name "Schedule B."[17] The Solicitation also states that an offeror's "[p]rice proposal shall include completed Schedule B. In the event there is a discrepancy between sections of the price proposal and Schedule B, Schedule B will govern."

---

[17] Throughout this Opinion, the court has discussed the Schedule of Supplies/Services present in the Solicitation. The part of the Solicitation that the parties refer to as "Schedule B" is the same part of the Solicitation that the court refers to as the Schedule of Supplies/Services.

Regarding Section B, which defendant and defendant-intervenor assert included Schedule B, page thirty-one of the Solicitation provided the following overview of the Solicitation:

SECTION A SOLICITATION GENERAL INFORMATION...............................................32
SECTION B PRICE SCHEDULE GENERAL INFORMATION ......................................34
SECTION C - CONTRACT CLAUSES ..............................................................................34
ADDENDUM to CLAUSE 52.212-4.................................................................................43
SECTION D - DOCUMENTS, EXHIBITS OR ATTACHMENTS...................................76
PERFORMANCE WORK STATEMENT (PWS)..............................................................77
PART 1:  GENERAL ..........................................................................................................77
PART 2:  DEFINITIONS AND ACRONYMS....................................................................83
PART 3:  GOVERNMENT FURNISHED PROPERTY, EQUIPMENT, INFORMATION, OR
SERVICE (GFP/E/I/S)........................................................................................................91
PART 4:  CONTRACTOR FURNISHED ITEMS AND RESPONSIBILITIES ..............103
PART 5:  PROGRAMS SUPPORT SERVICES SPECIFIC TASKS................................105
PART 6:  REQUIRED PLANS AND DOCUMENTS...........................................137
PART 7:  APPLICABLE PUBLICATIONS (CURRENT EDITIONS)................................145
PART 8: SPECIAL PROVISIONS..................................................................................148
TECHNICAL EXHIBIT/ATTACHMENT LISTING ......................................................145
SECTION E - SOLICITATION PROVISIONS...............................................................176
ADDENDUM to CLAUSE 52.212-1: ..............................................................................189
ADDENDUM TO PROVISION 52.212-2.........................................................................196

The first subsection in the Solicitation, Section A, is labeled "SECTION A SOLICITATION GENERAL INFORMATION." (capitalization in original). Section A of the Solicitation stated: "Pricing Schedule and Periods of Performance (POP) Service dates for each CLIN are detailed in Section B. Note: Exceptions to line item structure in Section B may result in a bid not considered for award." (capitalization in original). The parties dispute regarding Schedule B and Section B stems from the statement in Section A of the Solicitation that "[e]xceptions to line item structure in Section B may result in a bid not considered for award."

According to the overview of the contents of the Solicitation, the second section in the Solicitation was titled "SECTION B PRICE SCHEDULE GENERAL INFORMATION." (capitalization in original). The second section in the Solicitation, in its entirety, provided:

**SECTION B PRICE SCHEDULE**

1.  PERIOD OF PERFORMANCE (POP).  Service dates are as follows:

| Performance Period | Performance Period Dates |
|---|---|
| Base Period | 01/01/2018 thru 09/30/2018 |
| Option Period 1 | 10/01/2018 thru 09/30/2019 |
| Option Period 2 | 10/01/2019 thru 09/30/2020 |
| Option Period 3 | 10/01/2020 thru 09/30/2021 |
| Option Period 4 | 10/01/2021 thru 09/30/2022 |
| Option Period 5 | 10/01/2022 thru 09/30/2023 |
| Option Period 6 | 10/01/2023 thru 09/30/2024 |
| Option Period 7 | 10/01/2024 thru 09/30/2025 |

2.  Phase-In Period. A phase-in period of two-weeks is planned and will commence after the post award conference meeting upon award of contract. There is no specific pricing line in the Schedule of Prices, however, pricing for this should be identified in the pricing volume. If there is no cost associated with phase-in, it should also be identified.

When the Agency issued Amendment No. 3 to the Solicitation, Section B was amended to state:

**SECTION B PRICE SCHEDULE**

1.  PERIOD OF PERFORMANCE (POP).  Service dates are as follows:

| Performance Period | Performance Period Dates |
|---|---|
| Base Period | 07/01/2018 thru 09/30/2018 |
| Option Period 1 | 10/01/2018 thru 09/30/2019 |
| Option Period 2 | 10/01/2019 thru 09/30/2020 |
| Option Period 3 | 10/01/2020 thru 09/30/2021 |
| Option Period 4 | 10/01/2021 thru 09/30/2022 |
| Option Period 5 | 10/01/2022 thru 09/30/2023 |
| Option Period 6 | 10/01/2023 thru 09/30/2024 |
| Option Period 7 | 10/01/2024 thru 09/30/2025 |

2.  Phase-In Period. A phase-in period of one month is planned for June 1-30, 2018.  CLIN 0001AA shall reflect all cost associated with this phase in.  If there is no cost associated with phase-in, it should be identified at CLIN 0001AA as Zero dollars or No Cost (NC).

(highlight in original). Protestor's position is that the immediately above image is, in its entirety, Section B, as amended, and that Schedule B is not included in Section B because Schedule B is not contained in the above-image of "SECTION B PRICE SCHEDULE." (capitalization in original).

The Solicitation, however, indicates that Schedule B, which is the Schedule of Supplies/Services, is included as part of Section B of the Solicitation, as Section A of the Solicitation stated that "Pricing Schedule and Periods of Performance (POP) Service dates for each CLIN are detailed in Section B. Note: Exceptions to line item structure in Section B may result in a bid not considered for award." (emphasis added) (capitalization in original). When the Solicitation was issued, the section of the Solicitation labeled in the overview of the Solicitation as "SECTION B PRICE SCHEDULE GENERAL INFORMATION" contained information relating to the "Periods of Performance (POP) Service dates," but did not include information on "each CLIN" or the "line item structure in Section B."[18] (capitalization in original). The section labeled "SECTION B PRICE SCHEDULE GENERAL INFORMATION" did not include any information related to the quantity, unit amount, unit price, or total amount of individual CLINs, which Section A of the Solicitation indicated would be "detailed in Section B." (capitalization in original).

The "Pricing Schedule," which the Solicitation stated would be "detailed in Section B," appears to have referred to Schedule B, which is the Schedule of Supplies/Services.

---

[18] When the section in the overview of the Solicitation labeled as "SECTION B PRICE SCHEDULE GENERAL INFORMATION" was amended by Amendment No. 3, that section was amended to state that CLIN 001AA was to reflect a one-month phase-in period, but that was the only CLIN mentioned in the the section in the overview of the Solicitation labeled as "SECTION B PRICE SCHEDULE GENERAL INFORMATION." (capitalization in original).

Section A of the Solicitation indicated that the "line item structure" was contained "in Section B." Schedule B, the Schedule of Supplies/Services, contained all of the CLINs and descriptions of the CLINs throughout the base period of performance and option periods of performance. Schedule B provided offerors with the quantity amounts and unit amounts that offerors were to price in the offerors' proposals submitted in response to the Solicitation. Schedule B also contained "Periods of Performance (POP) Service dates" for the base period of performance and each option period of performance. (capitalization in original). The section of the Solicitation labeled in the overview of the Solicitation as "SECTION B PRICE SCHEDULE GENERAL INFORMATION" only appears to have summarized the "Periods of Performance (POP) Service dates" in Schedule B in a chart and appears to have provided "GENERAL INFORMATION" about the periods of performance defined in Schedule B. (capitalization in original). If Schedule B was not part of Section B, the statement in Section A that "[e]xceptions to line item structure in Section B may result in a bid not considered for award" would have been meaningless, as the section of the Solicitation labeled in the overview of the Solicitation as "SECTION B PRICE SCHEDULE GENERAL INFORMATION," as issued on October 11, 2017, did not include any information related to contract line item numbers or "line item structure." (capitalization in original).

Moreover, an addendum to FAR clause 52.212-1 in the Solicitation stated that "**Volume 3 shall be labeled Factor C-Price** (Section B, to include price breakdown), SF 1449, SF30 Amendments, Section B price and price breakdown." (emphasis in original). The addendum to FAR clause 52.212-1 in the Solicitation indicates that Section B of the Solicitation included "price and price breakdown," which is contained in Schedule B. Information related to "price and price breakdown" is not contained in the section of the Solicitation labeled in the overview of the Solicitation as "SECTION B PRICE SCHEDULE GENERAL INFORMATION," which indicates the Section B of the Solicitation encompassed more than just the information contained in the section of the Solicitation labeled as "SECTION B PRICE SCHEDULE GENERAL INFORMATION." (capitalization in original).

The Agency's answers to questions in Amendment No. 3 to the Solicitation also indicate that Schedule B is part of Section B.[19] For example, the Agency categorized question 9, which, as discussed above, asked about the omitted government ceiling or not-to-exceed amounts for CLINs X007AA and X007AB on the Schedule of Supplies/Services, as being related to "**Section B Price Schedule**." (emphasis in original). Question and answer 6 in Amendment No. 3 provided:

6.   **Q: Section B Price Schedule:** SF1449/Optional Form 336 – Custodial Services
     CLIN's X002AA; X002AB; X002AC; X002AD; X002AE:  How did the Government
     arrive at the quantities reflected in these CLINs?  Do these quantities represent a
     certain percentage of occupancy?  If so, what is the percentage used?
     **A: These quantities represent 90% of the occupancy rate.**

---

[19] Amendments No. 1, 2, 4, and 5 do not appear to address the organization of the Solicitation or different references to Schedule B and/or Section B.

(emphasis in original). As noted above, the government SF 1449 and OF 336 comprised Schedule B, which the Agency, in question 6, labeled as being part of the "**Section B Price Schedule**." (emphasis in original). The Agency's answer to question 6 also responds to questions about individual CLINs on the Schedule of Supplies/Services and indicates that those CLINs are part of "**Section B**." (emphasis in original). The CLINs in question 6 were not included in the part of the Solicitation which protestor argues contained the entirety of Section B.

The court, therefore, concludes that Schedule B, which is the Schedule of Supplies/Services, was part of "Section B" of the Solicitation, and that the Solicitation advised offerors that "[e]xceptions to line item structure in Section B may result in a bid not considered for award." In the above-captioned protest, as discussed above, offerors were required to submit in their price proposals the government provided ceiling or not-to-exceed amounts for CLINs X007AA and X007AB on the Schedule of Supplies/Service, which were provided in the Agency's answer to question 9 in Amendment No. 3 to the Solicitation. The Solicitation stated that "[e]xceptions to line item structure" on the Schedule of Supplies/Services "may result in a bid not considered for award." The Agency, therefore, reserved the right to exclude offerors which failed to include required pricing information for the CLINs X007AA and X007AB.

Moreover, even if Section B did not include Schedule B, other sections of the Solicitation required offerors to submit complete price proposals. The Solicitation contained FAR clause 52.212-1, as well as an addendum to FAR clause 52.212-1. FAR clause 52.212-1 in the Solicitation stated that, "[a]s a minimum, offers must show . . . Price and any discount terms." The addendum to FAR clause 52.212-1 stated that an offeror's "[p]rice proposal shall include price for the phase-in period, base period and seven option periods." The addendum to FAR clause 52.212-1 in the Solicitation also stated: "Offerors shall provide a detailed breakdown of how it arrived at proposed costs as follows: Contract Line Item Number . . . ." An offeror's price proposal was required to include "Section B price and price breakdown," and, as stated in the Solicitation, an offeror's "[p]rice proposal shall include completed Schedule B."

Safeguard's price proposal, however, did not include the required amounts for CLINs X007AA or CLINs X007AB, and, therefore, did not "include completed Schedule B" as required by the Solicitation. Safeguard left the "UNIT PRICE" and "AMOUNT" columns blank for CLINs X007AA and X007AB on the Schedule of Supplies/Services Safeguard submitted as part of its price proposal. (capitalization in original). For example, in Safeguard's price proposal, CLIN X007AA appeared as:

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| 0007AA | Service Work Requests - Maintenance | 1 | LO | | |

As indicated in the immediately above image, Safeguard did not include a "UNIT PRICE" or "AMOUNT" on the Schedule of Supplies/Services in its proposal for CLINs X007AA and X007AB. (capitalization in original). Safeguard also failed to include subtotals for the

base period of performance and option periods of performance on the Schedule of Supplies/Services that Safeguard submitted as part of its price proposal. For example, regarding the fourth option period of performance, Safeguard's price proposal stated:

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | SUBTOTAL CLINS 4001 THROUGH 4007AB = | | | | |

Moreover, Safeguard submitted the following chart as part of its price proposal:

[redacted]

The immediately above chart, as well as the Schedule of Supplies/Service submitted as part of Safeguard's price proposal, indicate that Safeguard did not include the required amounts for CLINs X007AA and X007AB as part of its price proposal in the base period of performance or any of the option periods of performance. Consequently, Safeguard's total proposed price, which Safeguard calculated as being [redacted], did not include the amounts associated with CLINs X007AA and X007AB, as Safeguard's price proposal effectively priced CLINs X007AA and X007AB at $0.00.

All offerors responding to the Solicitation were required to submit a complete price proposal because price was one of the factors that the Agency considered when making an award under the Solicitation. By failing to include the government ceiling or not-to-exceed amounts for CLINs X007AA and X007AB listed in the Agency's answer to question 9 in Amendment No. 3, Safeguard failed to include prices for those sixteen CLINs. The government provided the announced amounts for CLINs X007AA and X007AB totaling $6,121,228.00 across the base period of performance and the seven option periods of performance. Because Safeguard did not include the amounts for CLINs X007AA and X007AB as instructed by the Solicitation and Amendment No. 3, Safeguard's total proposed price did not include the $6,121,228.00 associated with CLINs X007AA and X007AB. Had Safeguard priced CLINs X007AA and X007AB in accordance with the Agency's instructions, Safeguard's total proposed price would have been increased by $6,121,228.00, which would have increased Safeguard's total propose price from [redacted] to [redacted]. Moreover, the amounts for CLINs X007AA and X007AB served a substantive purpose in an offeror's proposals because the amounts for CLINs X007AA and X007AB were binding amounts that an offeror, if awarded a contract under the Solicitation, would not be permitted to exceed without approval from the contracting officer.

The amounts offerors were to include in their price proposals for CLINs X007AA and X007AB also related to the Agency's evaluation of proposals. Under the Agency's evaluation scheme established in the Solicitation, the Agency was to "evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement." Additionally, the Solicitation stated:

As part of the price analysis, the government will evaluate its option to extend services (FAR Clause 52.217-8) by adding six months of the offeror's final option period price to the offeror's total price. This will result in the total evaluated price by which the determination cited under f. (1) will be based, in part.

Failure to meet the requirement that offerors include in the price proposals the government ceiling or not-to-exceed amounts for CLINs X007AA and X007AB impacted the Agency's ability to evaluate an offeror's price proposal because the amounts for CLINs X007AA and X007AB were necessary as part of an offeror's total proposed price. Because Safeguard's proposed prices for the base period of performance and for each of the options periods of performance did not include amounts for CLINs X007AA and X007AB, Safeguard's total proposed price was listed as $6,121,228.00 in the proposal lower than it would have been had Safeguard included the government ceiling or not-to-exceed amounts for CLINs X007AA and X007AB. Absent inclusion, the Agency may have been unable to compare Safeguard's deflated total proposed price to other offerors' total proposed price in accordance with the evaluation scheme specifically established in the Solicitation because Safeguard failed to include the amounts totaling $6,121,228.00 for CLINs X007AA and X007AB that other offerors, such as B&O, had included in their price proposals. Consequently, Safeguard's omission of the amounts for CLINs X007AA and X007AB was a material omission because the omission violated the terms of the Solicitation and had "more than a negligible impact on the price" of Safeguard's total proposed price in its proposal. See ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 508. Safeguard's omission of the amounts for CLINs X007AA and X007AB also was a material omission because the omission hindered the Agency's ability to "evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement," as stated in the Solicitation. Safeguard's failure to comply with the terms of the Solicitation, and amendments thereto, was a material error not subject to waiver under FAR clause 52.212-1(g), and the Agency did not act arbitrarily and capriciously by declining to waive Safeguard's material omission.

Moreover, the Agency should not have sought clarifications from Safeguard regarding its failure to comply with the Solicitation's directions and omission of the amounts for CLINs X007AA and X007AB because clarifications may not be used to cure "'material omissions'" or revise the "'cost elements of the proposal.'" See Dell Fed. Sys., L.P. v. United States, 906 F.3d at 998 (quoting JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 661 (2002), aff'd, 56 F. App'x 474 (Fed. Cir. 2003)). As stated in Sheryle Wood's March 22, 2018 Price Evaluation Report, as well as in Joseph Williams' June 8, 2018 and August 2, 2018 Source Selection Decision Documents, in order to remedy Safeguard's failure to include the amounts for CLINs X007AA and X007AB, the Agency would have had to establish a competitive range, engage in discussions with offerors, and obtain a revised price proposal from Safeguard.[20] A revised price proposal from Safeguard was

---

[20] Protestor's amended complaint and reply in support of its motion for judgment on the administrative record do not assert that it was arbitrary and capricious for the Agency to decide to not establish a competitive range and hold discussions with offerors in the competitive range. In protestor's motion for judgment on the administrative record,

necessary because, in order to correct Safeguard's material omission, Safeguard would have needed to price the sixteen CLINs for CLINs X007AA and X007AB, recalculate its prices for each period of performance, and recalculate its total proposed price. The Agency, therefore, did not abuse its discretion by choosing not to seek clarifications from Safeguard regarding its material omissions of the amounts for CLINs X007AA and X007AB, as clarifications would have been an inappropriate tool to remedy Safeguard's material omissions.

Safeguard further argues that the "the Agency had twice before been able to evaluate Safeguard's proposal despite the absence of the plug numbers." Documents in the administrative record, however, indicate that the Agency previously had identified Safeguard's failure to include amounts for CLINs X007AA and X007AB as an issue throughout the procurement process and that the Agency was not able to evaluate Safeguard's proposal as originally submitted by Safeguard, without unilaterally increasing Safeguard's total proposed price to account for the omitted amounts associated with CLINs X007AA and X007AB. In contracting officer's Sheryle Wood's March 22, 2018 Price Evaluation Report, Ms. Wood stated that, in Safeguard's price proposal, "the specific data to CLINS XXX7AA and XXX7AB were not plugged in for all years as instructed by Amendment 0003." According to Ms. Wood, Safeguard's total proposed price, which Safeguard had listed as [redacted], was "closer to [redacted]" because "the ODCS were only identified as a lump sum and errors in pricing of extended amounts for all years plus the omission of the IDIQ pricing reflects the total cost to be closer to [redacted]." It is true that, in the March 22, 2018 Price Evaluation Report, Ms. Wood stated:

> It is recommended that the Contracting Officer determine the [Safeguard's] price fair and reasonable as presented without need for discussion or exchanges with regard to price. Once the competitive range has been established, it is recommended that Safeguard Base Operations LLC (SBO) be retained in the competitive range for purposes of discussion. Calculation errors in all years, inclusion of the IDIQ data all years, and full breakdown of phase in costs and ODCs [other direct costs] would be the discussion element [sic] all years.

Sheryle Wood's March 22, 2018 Price Evaluation Report indicates that, as early as March 22, 2018, the Agency determined that Safeguard needed to submit a revised price proposal in order to correct errors in Safeguard's price proposal, including Safeguard's omission of the government provided ceiling or not-to-exceed amounts for CLINs X007AA and X007AB.

---

protestor mentions discussions once, stating: "At worst, Safeguard's failure to regurgitate DHS's plug-in numbers constituted a mere 'informality' or non-material concern that could have been easily resolved through clarifications (or discussions)." Protestor, however, has not provided any argument specific to why the Agency should have held discussions or cited to any case law addressing an Agency's decision to not establish a competitive range and hold discussions with offerors.

In source selection authority Joseph Williams' June 8, 2018 Source Selection Decision Document, however, Joseph Williams stated:

The price proposal [submitted by Safeguard] did not comply with instructions, containing .pdf copies of their spreadsheets rather than in excel as required, errors in pricing of extended amounts for all years, and omission of the IDIQ pricing (as required by RFP amendment). There is no yearly escalation except for the project management CLINs. (All other proposals include escalation of at least [redacted] for all CLINs, which the history of the current contract supports.) Their proposed price of [redacted] is the third lowest and although it is reasonable, it may be considered unrealistically low compared to the IGE. After accounting for errors and adding escalation to all CLINs, their total evaluated price increased by approximately [redacted] to [redacted] (without accounting for the floor cleaning services that were to be at no expense to the Government). [redacted] evaluated prices that are realistic, and awarding to this offeror presents some risk to the Government without a completely revised price proposal accounting for all costs, and given their Technical Approach and Corporate Experience ratings are lower than other offerors.

Because of a non-compliant price proposal, and a price that is unrealistically low, this proposal should have been eliminated from the competition without a technical evaluation.

Joseph Williams also stated that "[*d*]*iscussions and a substantial update to portions of their* [Safeguard's] *technical proposal as well as a completely revised price proposal would be necessary, but it is unlikely they would become much more competitive.*" (emphasis in original).

Joseph Williams' June 8, 2018 Source Selection Decision Document indicates that, by June 2018, the Agency considered Safeguard's proposal to be "non-compliant" and as requiring a "completely revised price proposal" after discussions. (emphasis omitted). Joseph Williams further asserted "this [Safeguard's] proposal should have been eliminated from the competition without a technical evaluation." Joseph Williams' June 8, 2018 Source Selection Decision Document also indicates that the Agency had increased Safeguard's total proposed price by more than [redacted] because of errors in Safeguard's price proposal, including Safeguard's omission of the government provided amounts for CLINs X007AA and X007AB. According to a chart in the June 8, 2018 Source Selection Decision Document, the Agency's "Total Evaluated Price" for Safeguard's proposal would have been [redacted], which was an increase from Safeguard's total proposed price of [redacted].

In Joseph Williams' August 2, 2018 Source Selection Decision Document, which was undertaken as part of corrective action taken by the Agency in response to Safeguard's June 21, 2018 protest at the GAO, Joseph Williams stated:

Their [Safeguard's] proposed price of [redacted] is the third lowest and although it is reasonable, it could potentially be unrealistically low compared to the IGE. The price proposal did not comply with instructions, containing .pdf copies of their spreadsheets rather than in excel as required, had errors in pricing of extended amounts for all years, and omitted the IDIQ pricing (as required by RFP amendment). Furthermore, there is no yearly escalation except for the project management CLINs. (All other proposals include escalation of at least [redacted] for all CLINs, which the history of the current contract supports.) After accounting for errors and adding escalation to all appropriate CLINs, their total evaluated price increased by approximately [redacted]. This is the [redacted] total evaluated prices that are realistic, but still approximately [redacted] the IGE. Awarding to this offeror presents some risk to the Government without a completely revised price proposal accounting for all costs, and given their [redacted].

Because of a non-compliant price proposal with a questionable low price, and [redacted], this proposal could have been eliminated from the competition without a technical evaluation.

According to the August 2, 2018 Source Selection Decision Document, "[*d*]*iscussions and a substantial update to portions of their technical proposal as well as a completely revised price proposal would be necessary for them to be eligible for award, and it is unlikely they would become much more competitive*." (emphasis in original). Thus, as in Joseph Williams' June 8, 2018 Source Selection Decision Document, Joseph Williams' August 2, 2018 Source Selection Decision Document indicates that the Agency considered Safeguard's proposal to be non-compliant and as requiring a revised price proposal. Joseph Williams' August 2, 2018 Source Selection Decision Document also indicates that Safeguard's proposal was not "*eligible for award*" and "could have been eliminated from the competition without a technical evaluation." (emphasis in original). Additionally, the August 2, 2018 Source Selection Decision Document provides that Safeguard's "Total Evaluated Price" was [redacted], which the Agency had computed as an increase from Safeguard's submitted price of [redacted].

The court also notes that, in Safeguard's August 24, 2018 amended protest at the GAO, however, Safeguard argued that the Agency had violated FAR § 15.404-1(d)(3) by increasing the price of Safeguard's proposal, which proposed a firm-fixed price. FAR § 15.404-1(d)(3) states:

Cost realism analyses may also be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors' proposed costs have resulted in quality or service shortfalls. Results of the analysis may be used in performance risk assessments and responsibility determinations. However, proposals shall

be evaluated using the criteria in the solicitation, and the offered prices shall not be adjusted as a result of the analysis.

FAR § 15.404-1(d)(3). According to Safeguard's August 24, 2018 amended protest at the GAO, "in a firm-fixed price procurement, 'an agency cannot make upward price adjustments for cost elements that the agency thinks may be priced too low.' IBM Corp., B-299504, et al., June 4, 2007, 2008 CPD ¶ 64 at 9." In response to Safeguard's August 24, 2018 amended protest at the GAO, on August 28, 2018, the Agency informed the GAO and Safeguard that it was going to take corrective action to correct mistakes in the Agency's consideration of Safeguard's proposal.

On September 20, 2018, source selection authority Joseph Williams issued his third Source Selection Decision Document. The September 20, 2018 Source Selection Decision Document, in which Safeguard was listed as Safeguard Base Operations JV, provided:

[redacted]

Regarding Safeguard's proposal, the September 20, 2018 Source Selection Decision Document stated that Safeguard's "price proposal was technically non-compliant because their price volume failed to include government provided amounts for the Service Work Request CLINs, as required by Amendment 3 to the solicitation. Therefore, this offeror is not eligible for award." Joseph Williams further stated that "*B&O Joint Venture is the only offer that could be awarded a contract without discussions. They submitted the best technical proposal that resulted in receiving the highest non-factor ratings, and they were one of only three offeros* [sic] *who submitted a compliant price proposal.*" (emphasis in original).

Although, in the June 8, 2018 and August 2, 2018 Source Selection Decision Documents, the Agency added more than [redacted] to Safeguard's proposed price and discussed the contents of Safeguard's proposal, in response to Safeguard's August 24, 2018 amended protest at the GAO, which argued that the Agency inappropriately had increased Safeguard's firm-fixed price, the Agency undertook corrective action, including a revised source selection decision. In the source selection decision following Safeguard's August 24, 2018 amended protest at the GAO, Joseph Williams declined to increase Safeguard's proposed price to remedy any errors in Safeguard's price proposal, perhaps in response to Safeguard's articulation of an alleged violation of FAR § 15.404-1(d)(3). Joseph Williams decision to disqualify Safeguard's proposal, however, was based on Safeguard's failure to comply with the requirement in the Solicitation and Amendment No. 3 to include the government provided amounts for CLINs X007AA and X007AB, and the Solicitation stated that "[e]xceptions to line item structure in Section B may result in a bid not considered for award" and required a "completed Schedule B." As discussed above, Safeguard's failure to submit amounts for CLINs X007AA and X007AB was a material omission, neither subject to waiver nor remediable through clarifications. Moreover, source selection authority Joseph Williams, in each of his three source selection decisions, consistently found Safeguard's price proposal to be "non-compliant"

and subject to elimination without a technical evaluation, and that Safeguard's proposal would have required discussions and a revised price proposal in order to be eligible for award. The court concludes that it was not arbitrary and capricious for the Agency to disqualify Safeguard's proposal based on Safeguard's failure to submit amounts for CLINs X007AA and X007AB.

## Whether the Agency Failed to Properly Conduct a Best-Value Tradeoff

Protestor also asserts that the Agency failed to conduct a best-value tradeoff analysis in accordance with the evaluation scheme established in the Solicitation. According to protestor, the Agency's September 20, 2018 Source Selection Decision Document "provides no language referring to a comparison or weighing of the offerors' proposals, particularly as regards Safeguard's lower priced, second-ranked technically, proposal."

Defendant, however, argues that the Agency was not required to engage in a best-value tradeoff between B&O's proposal and Safeguard's proposal because Safeguard's proposal was disqualified for failing to include the government ceiling or not-to-exceed amounts for CLINs X007AA and X007AB. Defendant-intervenor argues that the Agency did not need to consider Safeguard's proposal in its best-value tradeoff decision because Safeguard's proposal was non-compliant.

An agency "has broad discretion when making" a best-value tradeoff decision. Harmonia Holdings Grp., LLC v. United States, 136 Fed. Cl. 298, 313 (2018) (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996)); see also Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 553 (2013) (quoting the undersigned's decision in One Largo Metro, LLC v. United States, 109 Fed. Cl. 39, 96 (2013)). The United States Court of Appeals for the Federal Circuit has stated:

Procurement officials have substantial discretion to determine which proposal represents the best value for the government. See Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993); cf. Widnall v. B3H, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason. . . . even if the Board itself might have chosen a different bidder"); In re General Offshore Corp., B-251969.5, B-251969.6, 94-1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).

E.W. Bliss Co. v. United States, 77 F.3d at 449; see also Textron, Inc. v. United States, 74 Fed. Cl. at 326 ("[A]s defendant states, 'it is perfectly appropriate for an agency to refuse to further consider an offer once it has concluded that the offer is technically unacceptable.'" (quoting the defendant's brief in Textron, Inc. v. United States)).

In the above-captioned case, the Solicitation stated that, "[i]n accordance with FAR 52.212-2, award shall be made to the responsible offer on the basis of the best value that meets or exceeds the acceptability standards for non-price factors (FAR 15.101-2)." The Solicitation also stated that the "Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered." As discussed above, the Agency properly found that Safeguard's price proposal was non-compliant due to Safeguard's failure to price CLINs X007AA and X007AB and that Safeguard was not eligible for award under the Solicitation because Safeguard did not submit a proposal "conforming to the solicitation," as required in order to be eligible for award. Joseph Williams' September 20, 2018 source selection decision contained the technical and past performance ratings for Safeguard, as well as for all of the six offerors under the Solicitation, and discussed each offeror's proposal individually. Joseph Williams' September 20, 2018 source selection decision stated that Safeguard's proposal was non-compliant and ineligible for award because Safeguard "price volume failed to include government provided amounts for the Service Work Request CLINs, as required by Amendment 3 to the solicitation." Moreover, once the Agency properly determined that Safeguard was ineligible for award because it did not submit a proposal conforming to the requirements of the Solicitation, the Agency could not accept Safeguard's ineligible proposal.

Joseph Williams' September 20, 2018 Source Selection Decision Document further stated that B&O was the only offeror that was eligible to be awarded a contract without discussions. Joseph Williams discussed the factors for award identified in the Solicitation and indicated that B&O's price was fair and reasonable, and that B&O's proposal had received the highest technical evaluation rankings. In the September 20, 2018 Source Selection Decision Document, Joseph Williams also recounted several strengths identified in B&O's proposal and asserted that "award to this offeror would represent a good value to the Government due to the technical strengths and high Corporate Experience and Past Performance ratings." According to Joseph Williams, "*based on my integrated assessment of all proposals in accordance with the specified evaluation factors and sub-factors, it is my decision that B&O Joint Venture's proposal offers the best overall value to the Government.*" (emphasis in original). The Agency's best-value tradeoff, therefore, appears to have been properly supported by the administrative record.

## Whether the Agency Breached the Implied Duty of Good Faith and Fair Dealing

In Count III of protestor's amended complaint, protestor asserts that the Agency "breached the covenant of good faith and fair dealing by failing to fairly and honestly consider Safeguard's proposal," and that the Agency's decision to disqualify Safeguard's

proposal was "pretextual." According to protestor's amended complaint, "this Court 'has jurisdiction to consider a claim of breach of the implied duty to fairly and honestly consider a proposal in the context of a post-award bid protest.'" (quoting Innovative Test Asset Sols. LLC v. United States, 125 Fed. Cl. 201, 216 (2016)). Protestor contends that the Agency's "refusal to evaluate Safeguard's proposal *fully* during corrective action – as it represented to the GAO it would – and its decision instead to change course and disqualify Safeguard's proposal after it already had successfully evaluated the proposal, constitutes a breach of good faith and fair dealing." (emphasis in original) (citations omitted). In an attempt to support its argument, protestor cites to the January 31, 2019 affidavit signed by Diana Parks Curran, an attorney who had represented Safeguard before the GAO and who was designated as of counsel in Case No. 18-1515C, and the March 11, 2019 affidavit signed by Sadananda Suresh Prabhu, the president of SRM Group, neither of which became part of the administrative record in this protest. Nonetheless, protestor argues that the two affidavits "lead only to the conclusion that DHS's disqualification decision was pretextual and based on considerations that fell beyond the four corners of Safeguard's proposal." Protestor argues, without citing to any documents in the administrative record, that the "only rational conclusion" that could be "drawn" from the administrative record in this protest is that the Agency found Safeguard's proposal to be non-compliant as part of the Agency's effort to "exclude" Safeguard from receiving an award under the Solicitation. Defendant argues that protestor has not identified any information indicating that the source selection authority's decision to disqualify Safeguard was based on an "improper motive or bias." Defendant-intervenor, likewise, asserts that protestor's "bad faith allegations are baseless and contradicted by the administrative record."

"To recover under the implied covenant for bids to be fairly and honestly considered, a plaintiff has to establish arbitrary and capricious action by the government." Castle-Rose, Inc. v. United States, 99 Fed. Cl. 517, 531 (2011) (citing Keco Indus., Inc. v. United States, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974)); see also Innovative Test Asset Sols. LLC v. United States, 125 Fed. Cl. at 217 ("The standard applied by the court to a claim that the government has breached its duty to fairly and honestly consider a proposal is the same 'arbitrary and capricious' standard applied to other protest grounds under the APA."). When analyzing whether an agency breached its duty to fairly and honestly consider a proposal, the court examines whether "aspects of the evaluation process establish that the government's award decision was motivated by an irrational, pre-determined outcome" "without regard" to an offeror's proposal. See Innovative Test Asset Sols. LLC v. United States, 125 Fed. Cl. at 217.

In the above-captioned protest, the source selection authority for the procurement process for award under the Solicitation, Joseph Williams, rationally concluded in his September 20, 2018 Source Selection Decision Document that Safeguard's proposal was non-compliant because it failed to include the government provided ceiling or not-to-exceed amounts for CLINs X007AA and X007AB, and, therefore, was not eligible for award under the Solicitation. Joseph Williams' conclusion in the September 20, 2018 was not an "about-face," as protestor contends. Joseph Williams previously had indicated in his June 2, 2018 and August 8, 2018 Source Selection Decision Documents that

Safeguard's proposal was non-compliant based on Safeguard's failure to include the amounts for CLINs X007AA and X007AB, that Safeguard would need to submit a revised price proposal in order to become compliant with the Solicitation requirements, and that Safeguard's proposal should have been eliminated without a technical evaluation. As discussed above, the court has concluded that it was not arbitrary or capricious for the Agency to disqualify Safeguard's proposal based on Safeguard's failure to include the amounts for CLINs X007AA and X007AB in its proposal. Protestor has not cited to any documents in the administrative record indicating that the Agency's decision to disqualify Safeguard was "pretextual," and there do not appear to be any documents in the administrative record which would support such an assertion or the assertion that the Agency did not "fairly and honestly" consider Safeguard's proposal. Rather, the documents in the administrative record indicate that the Agency disqualified Safeguard based on Safeguard's failure to comply with the requirements in the Solicitation.

Although neither the January 31, 2019 affidavit signed by Diana Parks Curran nor the March 11, 2019 affidavit signed by Sadananda Suresh Prabhu are part of the administrative record in this protest, the court notes that consideration of those two affidavits would not alter the court's conclusion that the Agency did not breach its duty to fairly and honestly consider offerors' proposals. As discussed with the parties during the March 21, 2019 conference, the court had reviewed the allegations in both proffered affidavits, as well as the documents attached to Ms. Curran's affidavit, and determined that, based on the allegations in the affidavits and the documents already in the administrative record, the two proffered affidavits were not necessary for effective judicial review. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1380. In the January 31, 2019 affidavit signed by Diana Parks Curran, Ms. Curran discusses her alleged, verbal communications with James Caine, an attorney advisor within the Agency's Office of Chief Counsel. According to Diana Parks Curran's January 31, 2019 affidavit, James Caine made statements to Ms. Curran such as "'it is not a secret that there is bad blood between FLETC and [SRM's President] Suresh [Prabhu].'" (alterations in original).

The Agency's Source Selection Plan for the Solicitation identified James Caine as the legal counsel for the procurement under the Solicitation. As legal counsel, James Caine was a non-voting member of the source evaluation board whose role was to provide legal advice to the source selection authority and the source selection evaluation board. James Caine was to "not participate in the caucus process unless specifically asked to do so by the board Leader" and was to "have restricted visibility of the proposals." Based on the documents in the administrative record, as well as the description in the Agency's Source Selection Plan, James Caine's role as legal advisor did not include evaluating offerors' proposals or making a source selection decision, which was Joseph Williams' responsibility. Thus, it appears that James Caine only had a limited, legal advisory role and did not breach the Agency's implied duty to fairly and honestly consider Safeguard's proposal, a responsibility which primarily fell on the shoulders of source selection authority Joseph Williams.

In the March 11, 2019 affidavit signed by Sadananda Suresh Prabhu, Mr. Prabhu alleges that James Caine called him "'greedy' and 'unscrupulous'" and asserted that the

cost of litigating a contract claim with the Agency would "'bankrupt'" SRM Group. Once again, while, if proven, Mr. Caine's words would have been inappropriate, his words did not necessarily relate to the source selection decision and there is no indication in the administrative record that James Caine evaluated Safeguard's proposal in response to the Solicitation or made a source selection or elimination decision. In the March 11, 2019 affidavit signed by Sadananda Suresh Prabhu, Mr. Prabhu further alleges:

> A few days after the Amended REA was filed, on or about September 25, 2017, Ms. Wood called me wanting to know why SRM had chosen to file another REA.[21] She stated that I had "humiliated" her by filing the Amended REA and vowed never to work with me or SRM in the future. I asked her if that meant that DHS would not renew SRM's Contract, and her response was, "Nobody who has ever sued the Government has been a [sic] awarded a Contract."

> During that same telephone conversation in September 2017, Ms. Wood told me that she would no longer talk to me or meet with me. Since then, Ms. Wood has refused to meet with either me or SRM's Program Manager for the Contract, Mr. Larry McLendon.

(capitalization in original).

Sheryle Wood completed her March 22, 2018 Price Evaluation Report regarding proposals received in response to the Solicitation. In the Price Evaluation Report, Sheryle Wood determined that Safeguard, as well as three other offerors, had failed to include the amounts provided for the CLINs X007AA and X007AB in the proposals. In the Price Evaluation Report, regarding Safeguard's proposal, however, Sheryle Wood asserted:

> It is recommended that the Contracting Officer determine the [Safeguard's] price fair and reasonable as presented without need for discussion or exchanges with regard to price. Once the competitive range has been established, it is recommended that Safeguard Base Operations LLC (SBO) be retained in the competitive range for purposes of discussion. Calculation errors in all years, inclusion of the IDIQ data all years, and full breakdown of phase in costs and ODCs [other direct costs] would be the discussion element [sic] all years.

Sheryle Wood's March 22, 2018 Price Evaluation Report, therefore, indicates that, even after the alleged September 2017 conversation, if it occurred, between Ms. Wood and Mr. Prabhu, Sheryle Wood recommended that Safeguard be included in a competitive range for discussions, so that Safeguard could correct errors in its price proposal. The March 22, 2018 Price Evaluation Report indicates that Sheryle Wood did not breach her duty to fairly and honestly consider proposals, including Safeguard's proposal, as well as other proposals also found to contain errors, as Sheryle Wood appears to have evaluated

---

[21] As noted above, SRM Group was the incumbent contractor providing dormitory maintenance services to the Agency under the SRM Group Contract.

Safeguard's price proposal and to have proposed a path by which Safeguard could be maintained in the competition under the Solicitation. Ultimately, Joseph Williams, the source selection authority, declined to establish a competitive range and decided to disqualify Safeguard's proposal and other non-compliant proposals. Under the Agency's Source Selection Plan, Joseph Williams was responsible for determining whether to engage in discussions and for selecting an offeror for award. The March 11, 2019 affidavit signed by Sadananda Suresh Prabhu does not contain allegations related to the conduct of Joseph Williams. In sum, the administrative record does not indicate that the Agency breached its duty to fairly and honestly consider proposals, even if the court were to consider the January 31, 2019 affidavit signed by Diana Parks Curran and the March 11, 2019 affidavit signed by Sadananda Suresh Prabhu, both of which affidavits were not permitted by the court to be included in the administrative record as not necessary for effective judicial review.

## **Standing**

Moreover, defendant-intervenor, but not defendant, argues that Safeguard lacks standing in the above-captioned protest. At the oral argument, counsel of record for protestor, for the first time, argued that Safeguard had standing based on the court's decision in Safeguard Base Operations, LLC v. United States, 140 Fed. Cl. 670, in which the court determined that "Safeguard, as an actual offeror, has a direct economic interest in the resultant contract issued under the Agency's Solicitation and has standing in the above-captioned bid protest to challenge the Agency's override of the CICA stay implemented when Safeguard" filed its fifth bid protest at the GAO. Id. at 685 (citations omitted). The standing issue in Safeguard Base Operations, LLC v. United States, 140 Fed. Cl. 670, did not involve a challenge to Safeguard's standing as an 8(a) offeror, but, rather, involved Safeguard's standing in the context of the Agency's decision to override the CICA stay and Safeguard's challenge of the Agency's override decision. See id. at 683-85. The court, therefore, has not previously addressed the issue of whether Safeguard is an 8(a) eligible joint venture.

The Tucker Act grants the United States Court of Federal Claims

jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(a)(1) (2018). In order to have standing to sue as an "interested party" under this provision, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. See Todd Constr., L.P. v. United States, 656 F.3d at 1315 (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract.'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009))); see also Blue & Gold Fleet, L.P. v.

United States, 492 F.3d at 1317; Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 693 (2010) ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006); Statistica, Inc. v. Christopher, 102 F.3d at 1580-81; Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988); and Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332 (1980))).

In a post-award bid protest, such as the above-captioned bid protest, the "protestor must 'establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.'" Mgmt. & Training Corp. v. United States, 137 Fed. Cl. 780, 783-84 (2018) (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)); see also Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (quoting MCI Telecomms. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989)); Timberline Helicopters, Inc. v. United States, 140 Fed. Cl. 117, 120 (2018); Contract Servs., Inc. v. United States, 104 Fed. Cl. 261, 269 (2012). In order to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("The government acknowledges that proving prejudice for purposes of standing merely requires 'allegational prejudice,' as contrasted to prejudice on the merits . . . ."); Bannum, Inc. v. United States, 115 Fed. Cl. 148, 153 (2014); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1331; Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Statistica, Inc. v. Christopher, 102 F.3d at 1581; Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013); Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 557 (2012). "When the protest is brought after award of the contract, the Federal Circuit has defined the test for the requisite economic interest as a showing of 'substantial chance' of award absent the alleged error." U.S. Sec. Assocs., Inc. v. United States, 124 Fed. Cl. 433, 436 (2015) (quoting Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002)). "The question whether a protester 'ha[s] a substantial chance of securing the award,' Myers, 275 F.3d at 1370, turns on whether the protester would have had a substantial chance if not for the alleged errors." COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1383 (Fed. Cir. 2012) (alteration in original). Because standing is a jurisdictional issue, the showing of prejudice is a threshold issue. See Corus Grp. PLC. v. Int'l Trade Comm'n, 352 F.3d 1351, 1357 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

Defendant-intervenor asserts that Safeguard lacks standing in the above-captioned protest, because Safeguard, allegedly, does not have the requisite direct economic interest required to establish standing because it cannot demonstrate that it had a substantial chance of being awarded a contract under the Solicitation, which was set-aside for 8(a)-eligible contractors. According to defendant-intervenor, "Safeguard is

in violation of the SBA's 8(a) Program regulations for two reasons: (1) Safeguard's JV [joint venture] Agreement was in violation of the SBA's 8(a) JV requirements; and (2) Safeguard's 8(a) JV partner brings little to the JV other than its status as an 8(a) contractor." Defendant-intervenor asserts:

> B&O JV's arguments do not require or request the Court to make an initial size or 8(a) status determination, which is reserved for the SBA. . . . Instead, B&O JV's arguments relate to SBA's determinations that are "in connection with" this procurement because Safeguard's status as an 8(a) JV "is an essential element of the competition."

Protestor, however, argues that defendant-intervenor's standing argument "amounts to a size protest" that is beyond this court's jurisdiction. According to protestor, this court "consistently" has found that a size protest must initially be brought before the SBA. Protestor asserts that the SBA must make all formal size determinations.

Pursuant to 13 C.F.R. § 124.513(e) (2019), the "SBA must approve a joint venture agreement prior to the award of an 8(a) contract on behalf of the joint venture. A Participant may submit a joint venture agreement to SBA for approval at any time, whether or not in connection with a specific 8(a) procurement." 13 C.F.R. § 124.513(e). The SBA's approval of an 8(a) joint venture agreement "pursuant to paragraph (e) of this section [124.513]," however, "does not equate to a formal size determination," and "the size status of a joint venture that is the apparent successful offeror for a competitive 8(a) contract may be protested pursuant to §121.1001(a)(2) of this chapter." 13 C.F.R. § 124.513(b)(3) (2019); see also 13 C.F.R. § 124.517(b) (2019) (stating that the size status of an "apparent successful offeror" for a competitive 8(a) procurement may be protested under 13 C.F.R. § 121.1001(a)(2) (2019)).

"A size protest is a purely administrative claim before the SBA in which a small business concern competing for an 8(a) set aside objects to the size determination of another offeror." White Hawk Grp., Inc. v. United States, 91 Fed. Cl. 669, 673 (2010). In order to be considered a small business concern, an offeror must not exceed the size standard for the North American Industry Classification System (NAICS) code specified in a solicitation, which is to be designated by the contracting officer.[22] 13 C.F.R. § 121.402(a)-(b) (2019). A size protest must be filed with the contracting officer for the solicitation, who is required to forward the size protest to the SBA. See 13 C.F.R. § 121.1003 (2019); see also 13 C.F.R. § 121.1005 (2019). "The responsible Government Contracting Area Director or designee makes all formal size determinations in response to either a size protest or a request for a formal size determination, with the exception of size determinations for purposes of the Disaster Loan Program . . . ." 13 C.F.R. § 121.1002 (2019). The SBA will attempt to issue a formal size determination within fifteen days of receipt of the size protest. 13 C.F.R. § 121.1009(a) (2019).

---

[22] An entity that is applying to be certified as 8(a) eligible "must qualify as a small business for its primary industry classification." 13 C.F.R. § 121.404(b) (2019).

The regulation at 13 C.F.R. § 121.1101 states:

> Appeals from formal size determinations may be made to OHA [SBA Office of Hearings and Appeals]. Unless an appeal is made to OHA, the size determination made by a SBA Government Contracting Area Office or Disaster Area Office is the final decision of the agency. . . . The OHA appeal is an administrative remedy that must be exhausted before judicial review of a formal size determination may be sought in a court.

13 C.F.R. § 121.1101(a); see also Taylor Consultants, Inc. v. United States, 90 Fed. Cl. 531, 547 (2009) ("Importantly, 13 C.F.R. § 121.1101 provides explicitly that this administrative remedy 'must be exhausted before judicial review of a formal size determination *may be sought* in a court.'" (emphasis in original) (quoting 13 C.F.R. § 121.1101(a))); Int'l Mgmt. Servs., Inc. v. United States, 80 Fed. Cl. 1, 10 (2007) ("The Area Office's formal size determination may be appealed to the OHA, but if no appeal is taken, the Area Office's size determination is the final decision of the agency." (internal quotation marks and citations omitted)).

In the above-captioned protest, when the Solicitation was issued on October 11, 2017, the Solicitation stated that the NAICS code applicable to the Solicitation was NAICS code 561720. Defendant-intervenor's filings with this court make clear that defendant-intervenor is not requesting the court to evaluate Safeguard's size status under NAICS code 561720 or to determine whether SSSL, the 8(a) entity in the Safeguard joint venture, is in compliance with the requirements of the SBA's 8(a) program. As stated in defendant-intervenor's reply brief:

> The Court's review of this issue does not require a size determination, which is reserved for the Small Business Administration. Rather, B&O JV requests the Court find that Safeguard's joint venture agreement was noncompliant on its face with the 8(a) regulations, and that by failing to have a valid 8(a) joint venture agreement at the time of award set aside for 8(a) offerors, Safeguard was not an eligible 8(a) joint venture and thus not eligible for contract award. Because Safeguard was not eligible for award, it is not an interested party, does not have standing to bring this bid protest, and the protest should therefore be dismissed.

(citations omitted). Defendant-intervenor, therefore, appears to be arguing that Safeguard's 8(a) joint venture agreement is not valid under the regulations governing 8(a) joint venture agreements, which are discussed below. Protestor, however, argues that, "even looking beyond this Court's lack of jurisdiction to entertain B&O's argument [allegedly involving size protests], any challenge to Safeguard's 8(a) status could not be heard now *even if brought before the SBA*, since Safeguard was not identified as the apparent successful offeror [by the Agency under the Solicitation]." (emphasis in original). Protestor asserts that a "letter approving Safeguard as 8(a) eligible was included as part

of Safeguard's proposal," and is included in the administrative record, and that "'[d]eterminations under SBA's regulations are binding on federal procurement officers.'" (quoting Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1361).

"If approved by SBA, a Participant [in the 8(a) program] may enter into a joint venture agreement with one or more other small business concerns, whether or not 8(a) Participants, for the purpose of performing one or more specific 8(a) contracts." 13 C.F.R. § 124.513(a)(1) (2019). An 8(a) joint venture agreement is permissible only if the 8(a) contractor lacks the capacity to perform the work on its own, and the joint venture agreement is "fair and equitable and will be of substantial benefit to the 8(a) concern." 13 C.F.R. § 124.513(a)(2) (2019). Both entities to the 8(a) joint venture agreement must be "small under the size standard corresponding to the NAICS code assigned to the procurement." 13 C.F.R. § 124.513(b)(1) (2019); see also 13 C.F.R. § 121.103(h)(3) (2019). The contents of what must be included in an 8(a) joint venture agreement are set forth in 13 C.F.R. § 124.513(c).

In a competitive 8(a) procurement, the procuring agency must "request that the SBA district office servicing the apparent successful offeror determine that firm's eligibility for award." 13 C.F.R. § 124.507(b) (2019). After receiving the procuring agency's request, the "SBA will determine whether the firm identified by the procuring activity is eligible for award." 13 C.F.R. § 124.507(b)(1); see also FAR § 19.805-2(b)(1) (2019) ("[The] SBA will determine the eligibility of the apparent successful offeror and advise the contracting office within 5 working days after receipt of the contracting office's request for an eligibility determination."); White Hawk Grp., Inc. v. United States, 91 Fed. Cl. at 681 ("Under the prescribed procedures, the Army first makes its award decision and only then does the contractor's eligibility factor in the process."). "Eligibility is based on 8(a) BD [business development] program criteria," including certain criteria identified in 13 C.F.R. § 124.507(b). 13 C.F.R. § 124.507(b); see also FAR § 19.805-2(b) ("Eligibility is based on Section 8(a) program criteria."). If an apparent successful offeror in an 8(a) procurement is ineligible for award, the procuring agency "will then send to SBA the identity of the next highest evaluated firm for an eligibility determination. The process is repeated until SBA determines that an identified offeror is eligible for award." 13 C.F.R. § 124.507(b)(4).

"The eligibility of a Participant" for a "competitive 8(a) requirement may not be challenged by another Participant or any other party, either to SBA or any administrative forum as part of a bid or other contract protest," although the "size status of the apparent successful offeror for a competitive 8(a) procurement may be protested," as discussed above. See 13 C.F.R. § 124.517(a)-(b) (2019) (capitalization in original); see also FAR § 19.813(a) (2019); N. Wind Site Servs., LLC, SBA No. SIZ-5988 (Mar. 7, 2019); Trident[3], LLC, SBA No. SIZ-5315 (Jan. 24, 2012) ("[O]nce the [SBA] Office of Business Development has approved a mentor-protégé agreement or a joint venture agreement as compliant with the applicable regulations, the [SBA] Area Office has no authority to perform the same review."). "Anyone with information questioning the eligibility of a Participant to continue participation in the 8(a) BD program or for purposes of a specific 8(a) contract may submit such information to SBA under § 124.112(c)." See 13 C.F.R.

§ 124.517(e) (2019); see also FAR § 19.805-2(c) (2019). The regulation at 13 C.F.R. § 124.112 (2019) states that the SBA will review a "concern's eligibility" for the 8(a) program upon receiving "specific and credible" information that "a Participant no longer meets the eligibility requirements for continued program eligibility." 13 C.F.R. § 124.112(c)(1).

At least one Judge of the United States Court of Federal Claims' has determined that the court's bid protest jurisdiction under 28 U.S.C. § 1491(b)(1) includes challenges to the SBA's conclusion under 13 C.F.R. § 124.507(b) that an "apparent successful offeror" was not an 8(a) eligible joint venture due to the SBA's rejection of an amendment to the "apparent successful offeror['s]" 8(a) joint venture agreement. See CR/ZWS LLC v. United States, 138 Fed. Cl. at 222, 224-25, 227-30 (Kaplan, J.); see also Senter, LLC v. United States, 138 Fed. Cl. 110, 118 (2018) (Kaplan, J.) (determining that the court had jurisdiction over a challenge to the SBA's decision that an 8(a) joint venture agreement did not meet the joint venture requirements of 13 C.F.R. § 124.513 and citing to cases involving challenges to HUBZone decertification decisions to support the assertion that "[i]t is well established that an SBA decision on an offeror's eligibility for a set-aside contract is a decision made in connection with a procurement" (internal quotation marks and citations omitted)). Another Judge of the United States Court of Federal Claims determined that the court had jurisdiction over a protestor's challenge to the SBA's alleged "refusal to consider the [8(a)] joint venture agreement submitted by White Hawk/Todd [protestor] in connection with the JOC [job order contract] solicitation" because "it can be said that the challenged aspects of the SBA's action are 'in connection with' the Fort Sill JOC." See White Hawk Grp., Inc. v. United States, 91 Fed. Cl. at 679 (quoting 28 U.S.C. § 1491(b)(1)).

In the above-captioned protest, in a letter dated February 1, 2017, Terri Denison, District Director of the SBA's Georgia District Office, sent a letter to the Agency stating that the "SBA hereby accepts your [the Agency's] offer letter for competition in the 8(a) Business Development (BD) Program for **lodging management services at the FLETC Glynco Georgia facility. For this procurement, it has been determined that competition will be opened to all eligible 8(a) firms, nation-wide with no geographical restrictions.**" (emphasis in original). The SBA's February 1, 2017 letter further stated:

> Joint Ventures are allowed to bid on 8(a) competitive projects; therefore, we request that you include the following in your instructions to Bidders:
>
> > Joint Venture Agreements - Joint Ventures are allowable on competitive 8(a) set -asides [sic]; however, the joint venture agreement package or email notification of bid submittal by the joint venture must be received by SBA prior to proposal due date and the joint venture agreement must be approved before award of any resulting contract. If you are contemplating a joint venture on this project, you must advise your assigned SBA Business Opportunity Specialist (BOS) as soon possible. It is also recommended that the

agreement be submitted as soon as practicable to ensure compliance with established regulations.

Upon conclusion of your evaluations, directly advise the cognizant SBA District Office where the firm is serviced of the apparent successful offeror. Your notice must include the firm's name, the anticipated award value for the first year, and the total dollar amount of the award.

Additionally, the notice should include the date of the firm's representations and certifications and the date of the firm's initial date for receipt of offers so that a determination of eligibility can be made by SBA. Within five (5) business days of that notification, SBA will confirm the eligibility of the apparent successful offeror to receive the contract award and notify your office, in writing, of its determination. If the firm is found ineligible, the cognizant SBA District Office where the firm is serviced will inform you in writing, of the firm's ineligibility and request that you provide SBA the identity of the next highest evaluated firm for an eligibility determination.

(capitalization in original). As defendant-intervenor correctly notes in its motion for judgment on the administrative record, the above-quoted language that the SBA requested be included in the Solicitation does not appear to have been included in the Solicitation. The Solicitation, however, did state that, "[w]here a teaming agreement (as defined at FAR Subpart 9.6[23]) is proposed . . . a narrative/and or the actual teaming agreement if one exists, shall be submitted as part of the proposal by the managing partner of the Joint Venture or the prime contractor."

In Safeguard's proposal submitted in response to the Solicitation, Safeguard included a "JOINT VENTURE AGREEMENT" executed by SSSL and SRM Group on August 31, 2017. (capitalization in original). SSSL's and SRM Group's joint venture agreement stated that the "purpose of this unpopulated Joint Venture is to bid upon" the Agency's Solicitation for dormitory maintenance services. Safeguard's proposal also included a January 24, 2018 letter from Terri Denison, the District Director for the SBA's Georgia District Office, to Michael Randall, the Managing Member of SSSL. In the January 24, 2018 letter, Terri Denison stated that the Safeguard "joint venture agreement has been approved for purposes of performing the above stated requirement [the Solicitation, which was set aside for 8(a) offerors,] for Department of Homeland Security, Federal Law Enforcement Training Center for Dorm Management Services." The SBA, therefore, appears to have at least initially approved Safeguard as an 8(a) eligible joint venture for the purposes of submitting a proposal in response to the Agency's Solicitation regarding dormitory maintenance services and "performing" the requirements in the Solicitation.

---

[23] FAR Subpart 9.6 defines a "[c]ontractor team arrangement" as an arrangement in which "[t]wo or more companies form a partnership or joint venture to act as a potential prime contractor." FAR § 9.601 (2019).

The Agency, however, ultimately selected B&O as the awardee under the Solicitation.[24] As indicated in Joseph Williams' August 2, 2018 Source Selection Decision Document, "but for the alleged error[s]" alleged by Safeguard, see, e.g., Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367, and assuming the validity of Safeguard's 8(a) joint venture agreement, Safeguard's proposal appears to have had a substantial chance to receive an award under the Solicitation, as Safeguard received the second highest rating for non-price factors and had the third lowest "Price as Submitted" out of the seven offerors. (capitalization in original). Safeguard's "Price as Submitted" also was more than $11,000,000.00 less than B&O's "Price as Submitted."[25] (capitalization in original). The Agency, however, does not appear to have requested that the SBA "determine" Safeguard's 8(a) "eligibility for award" under 13 C.F.R. § 124.507(b), as Safeguard was not selected as the "apparent successful offeror" under the Solicitation. The SBA, therefore, does not appear to have determined Safeguard's eligibility for award under 13 C.F.R. § 124.507(b) or to have reconsidered its earlier statement in the SBA's January 24, 2018 letter that the Safeguard 8(a) joint venture was "approved for purposes of performing the above stated requirement for Department of Homeland Security, Federal Law Enforcement Training Center for Dorm Management Services." Moreover, in Joseph Williams' September 20, 2019 Source Selection Decision Document, the Agency stated that Safeguard's "Size Status" was an "8(a) Joint Venture." (capitalization in original). Thus, at the time Safeguard submitted its proposal in response to the Solicitation, Safeguard had received the SBA's approval as an 8(a) joint venture and was eligible to have been selected as the "apparent successful offeror" under the Solicitation, subject to the SBA's subsequent eligibility determination under 13 C.F.R. § 124.507(b). Because the Agency did not request the SBA verify that Safeguard was eligible as an 8(a) joint venture under 13 C.F.R. § 124.507(b), it is unclear whether the SBA would have altered its earlier determination that Safeguard was an eligible 8(a) joint venture.[26]

Moreover, the record before the court does not contain sufficient evidence based on which the court could decide whether it was improper for the SBA to approve Safeguard's 8(a) joint venture agreement. The only document in the record that was

---

[24] B&O's proposal submitted in response to the Solicitation does not appear to include a complete 8(a) joint venture agreement with a letter from the SBA approving B&O's 8(a) joint venture agreement. B&O's proposal, however, did include a "JOINT VENTURE TEAMING ARRANGEMENT," which appears to satisfy the requirement in the Solicitation that a "narrative/and or the actual teaming agreement if one exists, shall be submitted as part of the proposal" if a teaming agreement is proposed. (capitalization in original).

[25] Safeguard's "Price as Submitted," however, did not include the $6,121,228.00 associated with CLINs X007AA and X007AB, as discussed above. (capitalization in original).

[26] In the cases addressing the SBA's evaluations under 13 C.F.R. § 124.507(b), the SBA communicated with the apparent successful offeror regarding 8(a) eligibility and permitted revisions to the 8(a) joint venture agreements. See, e.g., CR/ZWS LLC v. United States, 138 Fed. Cl. at 218-20, 224; Senter, LLC v. United States, 138 Fed. Cl. 110 at 114-17.

generated by the SBA in connection with its approval of Safeguard's 8(a) joint venture agreement is the SBA's January 24, 2018 letter, which states, in a conclusory manner without any analysis, that the SBA was approving Safeguard's 8(a) joint venture agreement. The record does not contain information indicating why the SBA approved Safeguard's 8(a) joint venture or explaining the SBA's reasoning for approving Safeguard's 8(a) joint venture agreement.

The administrative record also does not contain Safeguard's entire 8(a) joint venture agreement that apparently was approved by the SBA in the SBA's January 24, 2018 letter. In its proposal submitted in response to the Solicitation, Safeguard only included a five-page joint venture agreement, in which Safeguard referenced three appendices to the Safeguard 8(a) joint venture agreement. None of the appendices to Safeguard's 8(a) joint venture agreement apparently submitted to the SBA were included in Safeguard's proposal submitted to the Agency or included in the administrative record, which hinders the court's ability to evaluate B&O's arguments. For example, B&O argues that "Safeguard's JV [joint venture] Agreement fails to meet the requirement to itemize all major equipment, facilities, and resources, and to include a detailed schedule of cost where practical." (citing 13 C.F.R. § 124.513(c)(6)). In Safeguard's 8(a) joint venture agreement, Safeguard states that, "[u]pon award of the 8(a) Contract, the Managing Venturer and the Partner Venturer will provide the following equipment, facilities, and other resources to the Joint Venture. A detailed schedule of cost or value to be provided to the Joint Venture is attached hereto as **Appendix B and C.**" (capitalization and emphasis in original). "**Appendix B and C**" are not in the administrative record, as those appendices were not included in Safeguard's proposal submitted in response to the Agency's Solicitation. (emphasis in original). B&O also argues that, "if Safeguard intended for SRM to assign Mr. Thomas to SSS [Safeguard Security Solutions, LLC] during performance [as project manager], the [Safeguard 8(a) joint venture agreement] proposal failed to comply with the mandatory requirement that a signed letter of intent be provided." Safeguard's five-page 8(a) joint venture agreement in the administrative record does not include a letter of intent, but, and, once again, without all of the materials Safeguard submitted to the SBA, this court is unable to determine whether such a letter of intent was submitted to the SBA by Safeguard.

There also appear to be a number of discrepancies in the record before the court regarding what actually constitutes the Safeguard 8(a) joint venture agreement between SRM Group and SSSL, as there appear to be at least three Safeguard 8(a) joint venture agreements in the record before the court. The first Safeguard 8(a) joint venture agreement appears in tab 3c of the administrative record as part of Safeguard's proposal submitted in response to the Solicitation, which is the version of the Safeguard 8(a) joint venture agreement discussed above. The second version of the Safeguard 8(a) joint venture agreement appears in tab 36j of the administrative record as an exhibit to Safeguard's August 20, 2018 protest at the GAO. In Safeguard's August 20, 2018 GAO protest, Safeguard labeled the second version of the Safeguard 8(a) joint venture agreement as "Exhibit 9 Joint Venture Agreement (8/11/17)." The third version of the Safeguard 8(a) joint venture agreement appears in the administrative record at tab 37c as exhibit 4 to Safeguard's August 24, 2018 amended protest at the GAO and was labeled

as "Exhibit 4 Joint Venture Agreement (8/11/17)."[27] The second version of the 8(a) Safeguard joint venture agreement, located at tab 36j, and the third version of the 8(a) Safeguard joint venture agreement, located at tab 37c, appear to be the same Safeguard 8(a) joint venture agreement, but both the second and third versions differ from the first version of the 8(a) Safeguard joint venture agreement located at tab 3c, which was submitted as part of Safeguard's proposal in response to the Solicitation.

Notably, all three versions of the 8(a) Safeguard joint venture agreement are dated August 31, 2017 and contain the signatures of Michael Randall, the president of SSSL, and Sadananda Suresh Prabhu, the president of SRM Group. The signature pages in all three versions of the Safeguard 8(a) joint venture agreement appear on page 5 of the agreements and appear to contain the exact same signatures and signature blocks. In the second and third versions of the Safeguard 8(a) joint venture agreement, the page numbering on the signature page appears as follows:

Page 5 of 7

In the first version of the Safeguard 8(a) joint venture agreement, which was submitted to the SBA, the page numbering on the signature page appears to have been altered and is listed as follows:

Page 5 of 5

The font of the second "5" in the immediately above image appears to be a different font than the font used for "Page 5 of" in the immediately above image.

There also are other unexplained differences between the first version of the Safeguard 8(a) joint venture agreement and the second and third versions of the Safeguard 8(a) joint venture agreement. While the first version of the Safeguard 8(a) joint venture agreement states that the purpose of the Safeguard joint venture was to submit a proposal in response to the Agency's Solicitation for dormitory maintenance services, the second and third versions of the Safeguard 8(a) joint venture agreement broadly state that the "purpose of this unpopulated Joint Venture is a business arrangement in which Safeguard Security Solutions and SRM agree to pool their resources for the purpose of accomplishing a specific task," without reference to the Agency's Solicitation. The second and third versions of the Safeguard 8(a) joint venture agreement include a statement that the "Managing Venture [SSSL] shall comply with 13 CFR §124.513(c)(2), and shall employ a project manager responsible for performance of the contract." The first version of the Safeguard 8(a) joint venture agreement does not include such a statement. The second and third versions of the Safeguard 8(a) joint venture agreement state that a "detailed schedule of cost or value to be provided to the Joint Venture is attached hereto as **Appendix A**," while the first version of the Safeguard 8(a) joint venture agreement

---

[27] Although Safeguard indicated in its protests at the GAO that Safeguard's 8(a) joint venture agreements were dated "8/11/17," neither the second version nor the third version of the Safeguard 8(a) joint venture agreement submitted to the GAO are dated "8/11/17," as discussed below.

states that a "detailed schedule of cost or value to be provided to the Joint Venture is attached hereto as **Appendix B and C.**" (emphasis in original). There were two appendices attached to the second and third versions of the Safeguard 8(a) joint venture, but no appendices were attached to the first version of the Safeguard 8(a) joint venture agreement that was submitted to the Agency in response to the Solicitation, which appears to have been approved by the SBA in the January 24, 2018 letter.[28]

Based on the record before the court, including the inconsistencies between the three Safeguard 8(a) joint venture agreements and that the court does not have all of the records submitted to the SBA in connection with Safeguard's request to be approved as an 8(a) joint venture, the court is unable to evaluate B&O's argument that the SBA erroneously approved Safeguard's 8(a) joint venture agreement. As of the date on which Safeguard submitted its proposal in response to the Solicitation, however, Safeguard appears to have been approved by the SBA as an eligible 8(a) joint venture and appears to have been eligible to be selected as the apparent successful offeror under the Solicitation, if Safeguard had not been properly disqualified as a result of the Agency's alleged errors. Because the SBA approved Safeguard as an eligible 8(a) joint venture and because there is not sufficient evidence in the record to find that the SBA erred when approving Safeguard's 8(a) joint venture agreement, the court denies defendant-intervenor's motion to dismiss for lack of standing. As discussed above, however, the court grants defendant's and defendant-intervenor's motions for judgment in their favor on the administrative record.

## CONCLUSION

Defendant-intervenor's motion to dismiss is **DENIED**. Protestor's motion for judgment on the administrative record is **DENIED**. Defendant and defendant-intervenor's motions for judgment on the administrative are **GRANTED**. Protestor's request in its amended complaint for a declaration and for injunctive relief is **DENIED**. The Clerk of the

---

[28] In the second and third versions of the Safeguard 8(a) joint venture agreement, Safeguard attached an August 7, 2018 "OPERATING AGREEMENT OF SAFEGUARD BASE OPERATIONS, LLC" as Appendix B. (capitalization in original). Some of B&O's arguments concerning standing attempt to draw contradictions between the statements in the August 7, 2018 Operating Agreement attached to the second and third versions of the 8(a) joint venture agreement and the statements in the first version of the Safeguard 8(a) joint venture agreement. The first version of the Safeguard 8(a) joint venture agreement, however, does not appear to have mentioned the August 7, 2018 Operating Agreement or to have included the August 7, 2018 Operating Agreement as an appendix. Given all of the discrepancies in the record regarding the different versions of the Safeguard 8(a) joint venture agreements, it is unclear whether the August 7, 2018 Operating Agreement is the final version of Safeguard's operating agreement or the correct version of Safeguard's operating agreement to rely upon when analyzing Safeguard's 8(a) joint venture submission to the SBA.

United States Court of Federal Claims is directed to enter **JUDGMENT** in accordance with this Opinion.

       **IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
      **Judge**
